## CLARKE and others *v.* SAWYER and others.

IN an inquiry as to the mental capacity of a testator, his case is not to be treated as one of general derangement of mind, because for four or five months he was laboring under and recovering from a severe attack of apoplexy, and was suffering its necessary and usual concomitants, a deprivation of reason in the outset, and its gradual restoration.

On the contrary, the recovery from the effects of such an attack, so far as to survive four years without an intervening attack, shows presumptively that the patient must have overcome its most violent and peculiar features.

The delirium or imbecility of mind, or the unconsciousness, which ensues from violent or acute diseases, is not to be regarded as establishing a general derangement of intellect, so as to throw the burthen of proving a sound mind, upon the party setting up a deed or will, executed long after the force of the disease is spent, or it has terminated in one of a different character.

On a question of testamentary capacity, the opinions of physicians are proper evidence ; but the opinions of other persons, are to be weighed by the facts upon which they are based, and such facts are more important than the opinions.

Proof of *instructions,* is never called for, when the will propounded is *officious,* i. e. bestows the property upon those who have natural or direct claims upon the bounty of the testator.

It is only where the person who draws or procures the will, takes a benefit under it, and there are circumstances of suspicion, greater or less, arising from the capacity of the decedent, the extent of the gift to such person, the claims of others upon the decedent, the amount of his property, or the like ; that proof of instructions is required.

A will is not to be set aside on as slight evidence of mental unsoundness, as would overturn a contract or conveyance executed on a consideration very questionable, or on terms grossly unequal, or a gift *inter vivos,* to one who had no reason to expect it from the donor.

Valid wills are made daily, by persons in the last stages of disease, when the bodily functions are totally prostrated, and the mental powers much impaired. These circumstances are not considered as entitled to weight, unless the testator's bequests are extravagant, or widely different from those which his situation and that of his family, would lead a sensible man to expect.

Clarke v. Sawyer.

The influence of affection or attachment, is not such an influence as will vitiate a will; or the mere desire of gratifying the wishes of one who is entitled to consideration and remembrance in the disposition of the decedent's effects.

The presumption of undue influence, exercised by a husband over a feeble and dying wife, is far stronger than any that can be indulged when a similar charge is made against a wife in respect of her deceased husband.

In a suit to set aside a devise, on the ground of the mental incapacity of the decedent, and of undue influence exercised by his second wife; it appeared that the decedent, a very active, intelligent, business man, when in his sixty-seventh year, had a severe attack of apoplexy, which entirely prostrated him in mind and body for two or three months; after which he slowly recovered, so far as to transact his business and sign his name, for two or three years. He continued partially paralyzed in his limbs, so as to be confined to his room, and most of the time bed-ridden, though occasionally riding in a carriage. His utterance was impeded, and not intelligible to those unaccustomed to it; and to such persons he appeared childish.

After he had recovered from the severity of the attack, his wife died, and seven months after that, he married her sister. Nineteen months subsequent to this event, he made a will, giving to her a life interest in all his property, and dividing the capital among his and her relatives. The will was prepared by a solicitor in his presence, carefully read to and signed by him, and the three witnesses to its execution, concurred in his being mentally capable of making it. His nearest relatives by blood, were two nieces having families, and another an infant; and he gave to the three, five-eighths of his estate after his wife's death. There was conflicting testimony as to his mental capacity, but the court sustained the devise. And there being sufficient mind, and the weight of evidence being against the allegation of undue influence, the court pronounced against that allegation.

The court forbore to direct an issue, (where it would otherwise have resorted to one,) because of the death of witnesses and the great lapse of time; the testimony having been taken eighteen years before the hearing.

A decision of the Chancellor, against the validity of a will, on the ground of the decedent's mental incapacity, reversing the surrogate's decree admitting it to probate; does not decide the question as to its validity as a will of real estate, either in the court of chancery or any other court.

The deposition of a witness, taken down by the proper officer after he was sworn, but which he refused to sign, was allowed to be read in evidence.

October 14, 15, and November 3, 4, 5, 1845; March 9, 1846.

THE bill in this cause was filed, in March ——, 1828, by James B. Clarke and Eleanor his wife, of Brooklyn, Kings county, and Peter Clarke and Maria his wife, of Mentz in the county of Cayuga, against Diana Fisher, (in the bill called Diana Rapelye,) Samuel A. Willoughby, Magdalena Cornelia Fisher, and Roswell Saltonstall and Catharine his wife. During the pendency of the

suit, Diana Fisher became the wife of Lemuel Sawyer, who was thereupon brought in as a defendant; and James B. Clarke dying shortly before the hearing, the suit proceeded in favor of the surviving complainants.

The bill stated that the two Mrs. Clarke's were the only surviving children, and the only heirs at law of George Fisher, who died in 1787, of whom John Fisher, late of Brooklyn, was the brother, and that they are the sole heirs at law and nearest of kin of John Fisher.

That John Fisher, being sixty-nine years old and upwards, and seised and possessed of a large real and personal estate, on the 3d of May, 1823, was afflicted with a violent stroke of apoplexy, which deprived him entirely of the use of his limbs, and of his speech, and for the time prostrated and almost destroyed his mental faculties, rendering him helpless in body, and in mind imbecile and totally incapable of thought. At that time, his wife Cornelia, formerly Rapelye, was living, by whom he had one child, a son who died under age some years before this event. That the disease of apoplexy, under which Mr. Fisher lay for some time in the situation described, gradually and finally turned to and terminated in *palsy*, under the influence of which disease he continued permanently, and by which he remained deprived almost entirely of the use of his limbs and speech, and so weakened, deranged, imbecile and unsound in mind, as to be unable to comprehend, except in a very slight degree, any thing that was said to him, and entirely incapable of comprehending or transacting any business whatever.

That his wife Cornelia died in February, 1824, but previously she had endeavored to procure him to make a will and used violence upon him to extort one from him; and in order to put an end to her abusing him, J. B. Clarke at her request, though convinced of Mr. Fisher's incapacity to make a valid will, prepared a will and procured him to execute it. By this will, a great proportion of his estate was given to his wife Cornelia. If not lost or destroyed, the will is in the hands of Diana Fisher. That the sickness, death and funeral of his wife, appeared in some degree to rouse for a short time, (but not exceeding one or two weeks after her death,) the mental faculties of Mr. Fisher,

so that he appeared to comprehend in some degree, what was passing around him, and to understand in some measure what conversation was addressed to him, and was able to answer partly by signs and partly by speech. But no favorable effect was at any time produced on his bodily health or strength, and he remained entirely palsied and helpless in limbs and body. His mental faculties began to droop and decay after the one or two weeks before stated, and he speedily became inadequate to comprehend or understand conversation addressed to him, and totally unequal to the transaction or comprehension of any business whatever.

That such faculties were in a better state during the fortnight or thereabouts immediately succeeding the death of his wife, than at any other period from May 3, 1823, until his death; and during that short time only, was he able to execute a valid will, if indeed he were capable during that time, which though the complainants believe, they are not satisfied of and do not assert.

That before the death of his wife, her sister Diana Rapelye, took up her abode in his house, and upon the death of his wife, with her niece Helen D. Hawksworth, who also resided there, took the whole charge and superintendence of his person, to the exclusion of his relatives, and against their wishes; especially so as to Mrs. Eleanor Clarke, who resided near by, and desired to take such charge and superintendence herself. That immediately after Mrs. Fisher's death, Diana and Mrs. Hawksworth attempted to procure him to make a will, and within the fortnight before mentioned, procured his consent to have one drawn and executed. That thereupon Mr. Doughty, a lawyer, went to Mr. Fisher's house and procured his instructions; which were intelligible, given without the suggestion of any one, and with an understanding and comprehension on his part of their meaning and effect. The will was drawn accordingly, carefully read to him, and his clear assent given to it, and he duly executed it. By this will, his property was left to the two Mrs. Clarke's, except certain legacies, and an annuity to his brother Lawrence Fisher. The will is in the possession of Diana Rapelye, *alias* Fisher. Mr. Fisher was then in a sounder state of mind, and

better able to execute a will, than he ever was afterwards, and the complainants to relieve him from the solicitations of those around him, and secure his peace and comfort, acquiesced in and permitted the execution of the will, though they were not and are not satisfactorily convinced that he possessed sufficient mind to make a valid will. Diana and Mrs. Hawksworth violently opposed the execution of this will, and declared it should be re-voked and annulled.

That shortly after its execution, Fisher's mind sunk from the temporary intelligence in which it had been, and in a short time he became imbecile, unsound in mind, unable to understand ex-cept to a very limited degree what was spoken to him, or was passing around him, and totally incompetent to transact business of any kind. As to his bodily health, it remained the same. He was paralysed in his limbs, unable to rise or in any way to help himself or satisfy his natural wants, he could articulate no more than two or three words in succession, and those very im-perfectly. And by reason of his situation, he became entirely subject to and under the control of those having charge of his person, who were Diana and Mrs. Hawksworth.

While in this state, and incapable of understanding business, those persons and Ann Smith a sister of Diana, fraudulently com-bined to revoke the will last mentioned and procure one in their favor. They took upon themselves the entire management of all his concerns and business, his moneys, rents, household af-fairs, &c: signed his name to receipts and checks, without his assent or knowledge. They were uncivil and insulting, and used opprobrious language to Mrs. Eleanor Clarke, when she visited her uncle, and finally prevented her in a great measure from visiting him. That in furtherance of their projects, they urged Mr. Fisher to get married, and finally procured a marriage ceremony to be performed between him and Diana Rapelye on the 31st of October, 1824, without the knowledge of any of his relations or former friends, none of whom, except his brother, were present. At that time, he was palsied, and entirely help-less and impotent in body, and his mind so prostrated that he could not understand the meaning of the marriage ceremony, or

give any valid assent thereto. No alteration in the mode of life of Mr. F. and Diana, ensued on the marriage, and they never cohabited together as husband and wife, except so far as she thereupon took the whole control of his household and other affairs. The complainants charged that the marriage was null and void.

That on the 2d of May, 1827, Diana and Ann Smith procured a will to be drawn for his execution, by B. B. Phelps, a lawyer of Brooklyn. That the instructions for drawing it, were given by Diana as being his answers to questions put in Mr. Phelps's presence, and which answers were almost entirely unintelligible to him ; and Fisher was too feeble and unsound in mind to comprehend what was addressed to him. Among other suggestions which she made, was to insert as a legatee and devisee Magdalena Cornelia Fisher, represented by her as the daughter of his brother George Lawrence Fisher, when she knew that this Magdalena was not his daughter, but was a suppositious child, falsely put forth as his child ; and Diana had her name thus inserted, to give color and plausibility to the scheme of the will. That Mr. Fisher was made to sign and acknowledge the will prepared by Mr. Phelps, but he did not understand the effect of his acts, and he was destitute of a sound and disposing mind, and the will is void. The bill then sets forth the will, in these words, viz.

" The last Will and Testament of John Fisher, of the village of Brooklyn and county of Kings.

I, John Fisher aforesaid, considering the uncertainty of this mortal life, and being of sound mind and memory, blessed be Almighty God for the same, do make and publish this my last will and testament, in manner and form following, that is to say :
*First.* I give and bequeath unto my beloved wife, Diana Fisher, the house and lot number thirteen, on the corner of Front street and Dock street, in the village of Brooklyn and county aforesaid ; it being my messuage or house wherein I now live, together with all the privileges and appurtenances to the same, to have and to hold the same forever.

*Item.* I give and bequeath unto my beloved wife, Diana, all

Clarke v. Sawyer.

my money which I have in the Bank of America, being two thousand dollars, and also in the City Bank, and also in the Merchants Bank, and also in the Long Island Bank, in the village of Brooklyn. It is my intention that my wife shall have all my money in the aforesaid banks, be the same more or less.

*Item.* I give and bequeath unto my beloved wife, Diana, all my personal property, either in money, bonds, notes or other securities, including rents due me, and furniture in the said house.

*Item.* I hereby give and bequeath unto my beloved wife, Diana, her heirs and assigns, all my freehold estate whatsoever, to hold to her the said Diana, her heirs and assigns forever.

*Item.* I hereby give and bequeath unto my little niece, Magdalen Cornelia Fisher, daughter of my brother Lawrence Fisher, deceased, at the decease of my beloved wife Diana, the one-fourth part of all my estate, both real and personal, and the interest of the one-fourth part of my real and personal property to be paid her yearly for her education.

*Item.* I give and bequeath after the death of my wife Diana, unto my beloved relations, to wit : the heirs of Maria Clarke, wife of Peter Clarke, and the heirs of Eleanor Clarke, wife of James B. Clarke, the heirs of Ann Smyth, wife of Charles Smyth, and the heirs of Isaac Rapelye, to be equally divided among them share and share alike, of the remaining three-fourths of my real and personal estate, meaning and intending that my niece, Magdalen Cornelia Fisher, daughter of my brother Lawrence Fisher, deceased, shall have one-fourth part of my said real and personal estate as aforesaid.

*Lastly.* I hereby appoint my beloved wife, Diana, my executrix, together with my beloved friend Samuel A. Willoughby, of the village of Brooklyn and county aforesaid, my executor of this my last will and testament ; and I do hereby give unto my said executrix and executor, authority and full power to sell and dispose of all, or such parts of my real estate, houses, lands, &c., as they may think best and proper, hereby revoking all former wills by me made.

In witness whereof, I have hereunto set my hand and seal,

this second day of May, one thousand eight hundred and twenty-seven.

JOHN FISHER.  [L. S.]

Signed, sealed and delivered, in the }
  presence of                       }
        WM. CORNELL,
        B. B. PHELPS,
        MATILDA JEWETT."

The bill further stated, that Mr. Fisher continued in the same paralyzed and prostrate state of body and mind after he signed this will, until he died on the 29th day of June, 1827, without having signed any other instrument in writing than those above mentioned, to the complainants known.

That the two Mrs. Clarke's, either under the second will set forth, or as sole heirs and next of kin, became thereupon entitled to his real and personal estate. That G. Lawrence Fisher, his surviving brother, died on the 12th of April, 1826, without issue. That as a part of their design upon the property of John Fisher, Diana and Ann Smith, on the 25th day of December, 1825, after a long series of threats, mingled with entreaties, induced Lawrence Fisher, a widower, without issue, to marry one Catharine Seaman, at the house and in the presence of his brother John ; Lawrence being at the time a lunatic, deprived of his senses, and incapable thereby of contracting marriage. He continued a lunatic, and on the 25th day of January, 1826, was on his pretended wife's application, taken to a lunatic hospital, and there remained until his death. That she thereupon, with the aid and instigation of Diana and Ann Smith, falsely gave out that she was pregnant by him, and went about with that appearance, and early in November, 1826, obtained an illegitimate female infant from the alms-house, and gave out that it was her own issue by Lawrence Fisher, and has ever since called it Magdalena Cornelia Fisher. That this Catharine Seaman, or Fisher, married Roswell Saltonstall in 1826.

That since the death of John Fisher, Diana has continued to occupy his dwelling house, and has taken possession of his other real estate.

The bill claimed that the will of 1827, if otherwise valid, was void for repugnancy; and is so obscure and contradictory, that it requires the construction of the court. The bill then submitted several different views of the meaning of the will, and its proper construction, if established. That on the will being propounded before the surrogate of the county of Kings, the complainants opposed its probate, but on the 25th day of February, 1828, it was adjudged by the surrogate to be a valid will, and admitted to probate, and letters testamentary granted to Diana, and S. A. Willoughby; and that the complainants have appealed to the chancellor from the surrogate's decree.

The bill prayed for an answer on oath; for an issue at law of *devisavit vel non;* that if the will be found invalid, Diana and the executor be decreed to give up all the property and papers of the decedent, and account for all they had received; for an injunction and receiver; that if the will be declared valid, the gifts therein to Magdalena Cornelia Fisher should be declared void; and the other clauses and provisions of the will should be construed and expounded by the court, according to the complainant's views of their effect, and the personal estate secured, if. Diana had any life interest therein; and for general relief.

The answer of Diana Fisher and Samuel A. Willoughby, admitting the complainant's relationship to John Fisher, his family and death, and such other facts stated in the bill as are not mentioned in this abstract, was substantially as follows; (Willoughby answering chiefly on information and belief, except as stated:)

They admitted John Fisher's apoplectic attack, in May 1823, and its immediate effect on his mind and body, as charged in the bill, but said that he was then only sixty-six years of age. That the apoplexy finally turned to and terminated in the palsy, and he continued permanently more or less under the influence of the latter disease, and by reason of it was unable to use his limbs freely, and at times spoke very indistinctly; but Mrs. Fisher denied that he was so weakened, deranged, and imbecile and unsound in mind, as to be unable to comprehend, except in a slight degree, what was said to him, or that he was incapable of comprehending or transacting business of any kind, except during a

short period, after his apoplectic attack. Willoughby stated that he never visited Fisher after that, except once in the spring of 1827, when the latter appeared perfectly sound in his mind ; and he always heard while Fisher was alive, that he was able to transact any kind of business, except just after his attack in 1823.

They traversed the charge as to Mrs. Cornelia Fisher's conduct towards her husband in procuring a will, and her efforts to have one made. They admitted that James B. Clarke prepared such a will as is first mentioned in the bill, and that it was executed by John Fisher during her life time, and Clarke and the witnesses to the will believed him capable of making a valid will, and the defendants aver that he was so capable.

Diana Fisher denied that his first wife's death produced the effect on Fisher's mental faculties stated in the bill ; or that they were in a better state for a fortnight or some short period after her death, than they were between May 3, 1823, and his death ; or that it was only during that short period, that he was capable of executing a will.

The answer stated that Diana came to live at Fisher's house on the 2d of June, 1823, as the companion of her sister, Mrs. F., at the request of her sister, and of Mrs. Eleanor Clarke, and with Fisher's approbation ; and she resided there till his death. At the death of Mrs. Cornelia F., Mrs. Hawksworth, who then and previously resided in the house, took the whole charge and superintendence of the domestic affairs of F., and the principal care of his person devolved upon her. The answer denied that any of his relatives were excluded or deterred, or prevented from visiting him, or from his care or charge, or from bestowing upon him all the attention and care they chose ; or that Diana was ever uncivil, or used insulting or opprobrious language to Mrs. Clarke ; or that Mrs. Hawksworth ever was or did, except once when Mrs. C. found fault with some domestic arrangement of Mrs. H., and there was warmth and harsh language on both sides.

The answer denied that after Mrs. C. F.'s death, Diana and Mrs. H., or either of them, made any attempts to procure Fisher to make a will ; but it admitted that as Diana understood, Mrs.

Eleanor Clarke desired to have such will made *to shut out* F.'s German relations. That four days after Mrs. C. F.'s death, such new will was executed by Fisher. That Doughty first drew a codicil to the former will, which from some cause unknown to the defendant, was not executed, and he then drew a will, such as is stated in the bill, and it was executed by Mr. Fisher. Jas. B. Clarke was present at its execution, and appeared to control and manage the business. Diana and Mrs. Hawksworth were requested to leave the room before it was read to F., and no one was permitted to be present then and at its execution, except Clarke and Doughty, and the persons invited by them. The answer denied that Fisher's mental faculties were then in a better state than they had been for several months previous, or than they were from thence to the day of his death. The defendants knew nothing of Mrs. Ann Smith's acts in regard to the will, or of the alleged instructions to Doughty; and they denied the alleged interference with its execution, and threats subsequent thereto.

That within a month after Diana's marriage with Mr. Fisher, he expressed his determination to cancel that will, and sent for it, and took it in his hands and tore the seal from it for the purpose of revoking it.

The answer denied that Fisher's mind began to sink and decay shortly or at any time after that will was executed; or that he became imbecile or unsound in mind after that, as charged in the bill. It stated on the contrary, that the state of his mental faculties improved thereafter, and during the last year of his life, they were stronger and sounder than when that will was executed. It denied that he was unable during that period, to rise or help himself, or satisfy his natural wants; or that from his incapacities or any cause, he became entirely dependent upon or under the control of those having the charge and superintendence of his person. His bodily health and condition were very much impaired.

The answer denied that there was any fraudulent combination to revoke the will, or that there was any attempt by Diana or any one with her assent, to avail herself of the weakened and

passive state of Fisher's mental faculties to procure a will or dis-position of his estate in her favor.

After his first wife's death, Mrs. Hawksworth with his assent managed his household affairs, but according to his direction and wishes; and under his supervision and direction, managed his business and concerns; but she paid no money, except small sums for current family expenses, and gave no receipts and signed no checks, without consulting him and obtaining his assent. Diana had nothing to do with any of these matters until after her marriage.

The answer denied that Fisher at any period after his first wife's death, was incapable of transacting or understanding business of any description, or was subservient to or dependent upon those having charge of his person, by reason of his mental imbecility or unsoundness of mind, or from any other cause.

The answer denied that there was any combination or agreement to procure Fisher to marry Diana, or that she or Ann Smith or Mrs. Hawksworth ever urged or persuaded him to marry any body, or said any thing to him to that effect, and it denied all the charges in the bill on that subject. It admitted the marriage between F. and Diana, and that none of his relatives, except his brother, were present; but it denied that it took place without the knowledge of his relatives and former friends. Fisher at that time though enfeebled in body, was not entirely helpless or impotent. His mental faculties at that time, were little if at all affected by his disease. He comprehended the meaning and effect of the ceremony, and gave the clergyman and witnesses most clear and satisfactory evidence of his capacity. The answer denied that no change took place in their manner of life after the marriage, and avers that it was actually consummated, and ever after during his life, they cohabited together as man and wife.

The answer denied that it was ever agreed between Diana and Ann Smith, that any will should be drawn; or that any will was ever drawn with intent to avail herself of the alleged weak and imbecile state of Fisher's mind, to induce him to execute it. It averred that the last will was drawn at his express request, and at his request Diana sent for Mr. Phelps. That Fisher's conversation not being so intelligible to strangers, as to those familiar

with him, she inquired his wishes from time to time while the will was framing, and truly repeated the same to Phelps, who wrote down the same and read it to Fisher, and received his assent to it before writing down any other answer. And this course was pursued as to all the items of the will. The answer denied giving any instructions to Phelps, except by thus repeating to him what F. said or directed ; and denied making any suggestion to him as to the disposal of his estate, except that she asked him what he intended to do with Magdalena Cornelia Fisher, whom Diana believed was his niece, and of whose legitimacy, she had then never heard or entertained a doubt. It also denied that F. was then incapable of comprehending what was said to or inquired of him, or assented to whatever she addressed to him, without understanding it. On the contrary he was then perfectly sound in mind, and competent to understand every thing that was said to or inquired of him, and as she believed, did perfectly understand every thing which she or Phelps said to him. The answer denied any fraudulent purpose or intention in mentioning Magdalena's name ; but Diana mentioned her name, because she believed Magdalena as his niece, was entitled to his attention and bounty.

The answer then stated the drawing of the will by Phelps from his memoranda, during which Diana was absent from the room, and Phelps read it slowly to Fisher, who clearly and distinctly assented to it, and then signed it and executed it in proper form. That he at that time perfectly understood and comprehended the will and the effect of his acts, and signed and published it of his own free will, uninfluenced by the suggestions of any person. That he had all the requisite intelligence to make a will, and possessed a sound and disposing mind, memory and understanding.

From the day of its execution till the day of his death, Fisher's mind was sound and competent to transact business, and his bodily health continued the same as it had been for several years before, and he sat up in his chair nearly half of the day that he died. That he signed and acknowledged four deeds conveying real estate, the day preceding the day of his death, all of which were sent to him for execution by James B. Clarke, and were

brought by his son Edward, and were executed in the latter's presence. That after the will, till his death or near that date, Fisher's mind was sufficiently sound to comprehend and confirm a will, and to transact any business.

The answer insisted on the validity of the will, and of the marriage, and that by virtue of and under the will, the estate of Fisher was vested in his wife Diana. It denied any participation or knowledge in or of the alleged fraud perpetrated on Lawrence Fisher, and the supposititious issue produced and set up by his wife ; and it denied that he was a lunatic when married, or was deprived of his reason. It also traversed the menaces and entreaties, and other matters stated in the bill, against the propriety and validity of that marriage. It admitted that some time after his marriage, he became a lunatic, and was confined till his death, but the defendant was ignorant upon whose application ; and she was wholly ignorant of any falsehood or deception in respect of his alleged issue. She believed the child was the lawful child of George Lawrence Fisher.

By the answer, Diana Fisher claimed the whole estate of John Fisher as her absolute property, and that the latter clauses of the will being repugnant to the first, were inoperative. But she avowed her readiness to conform to the decision of the court, if it should decide that she took only a life interest under the will.

The cause was put at issue by a replication. The infant answered by her general guardian. Before the adults had put in their answer, the chancellor on an appeal from the decree of the surrogate of the county of Kings, granting probate of the will of John Fisher, reversed that decree on the 28th of August, 1828, and adjudged that the will was invalid as a will of personal estate. (*Clarke* v. *Fisher*, 1 Paige, 171.) An appeal was taken from the chancellor's decree, to the court for the correction of errors, but before it was argued, a compromise was made as to the personal estate of the decedent, and an arrangement as to the rents and profits of the real estate, during the pendency of this suit. The personal property thus ceased to be litigated.

At a later period, under the sanction of the court, an agreement · was made by and between the complainants and the guardian

Clarke v. Sawyer.

*ad litem* of the infant, Magdalena Cornelia Fisher, by which the latter was to relinquish, for a specific sum, all her claim to the estate of John Fisher; and the decree in this suit was to carry this agreement into effect, irrespective of the result as to Diana Fisher.

In the controversy before the surrogate, on the probate of the will, in 1827, the parties had gone fully into the testimony bearing on its validity, all of which was taken in writing by the surrogate, and was printed on the appeal from the Chancellor's decree. This suit having slumbered a great many years, it was finally agreed, on its again moving, that each party should be at liberty to read at the hearing, the testimony so taken before the surrogate, or any of it, in the same manner as if it had been taken before an examiner in chancery. Accordingly, no other testimony was produced or read on either side.

The following is a synopsis of the testimony read at the hearing; stating in general terms, that portion of it given by others than physicians, which related to the period previous to the death of Mrs. Cornelia Fisher.

Benajah B. Phelps, for the defendants, testified that he was one of the subscribing witnesses to the will. He saw Mr. Fisher sign it in his presence, and that of one of the other witnesses. Mr. F. acknowledged the will in the presence of all three, by replying yes, to the inquiry if he acknowledged his signature to the will and as his last will and testament; and all three witnesses subscribed it at the same time, in the testator's presence. When he signed the will, he was sitting in his chair near the bed, and wrote on a small stand placed before him. The witness wrote the will. On his arrival, Mrs. Fisher told F., who was in bed, there was a person to write his will, and asked him if he was ready. He inclined his head, using a word which the witness understood to be, *yes*. Mr. and Mrs. F. then conversed about the disposition of his property. Witness could not understand all F. said, and received some explanations from Mrs. F., and in some instances applied to F., before writing the memoranda from which he drew the will, to ascertain if Mrs. F. had repeated F.'s ideas correctly. He made memoranda of the testator's wishes in this mode, and after completing those, he forth-

Clarke v. Sawyer.

with drew up the will from such memoranda, and when completed, he read it over to F., who assented to it, and then executed it. The witness discovered nothing to the contrary of a sound mind; he was not much acquainted with F. so as to judge, but his impressions were, F. was capable to execute a will. From the conversation with him, the witness judged him to be of sound mind. He seemed to be affected in his speech, and gave no connected directions as to his will, but when the provisions of it were mentioned to him, he assented to them. Each provision was read, canvassed and talked over, in his presence. When they came to that respecting his money, he mentioned the several banks in which it was, but in broken speech.

It was difficult for the witness to understand him on account of his broken speech. Mrs. F. asked him about different parts of his property, how he wished to provide for such and such persons, and he would then reply. While she was out of the room, witness asked him about the provisions made for her, if they were agreeable to his views, to which he assented. When she was about to pay witness for drawing the will, she unfolded ten dollars, and asked F. if she should pay that, or more. He replied, " *No,* that is enough." Witness discovered nothing throughout, but that the testator possessed his faculties, and was of sound mind. On appointing executors, witness proposed Mrs. F.'s name, and she proposed Mr. Vanderveer. On witness' mentioning that three executors would increase the expense, F. said two were enough, and directed it so. In May, 1826, witness called at F.'s house and saw him, to obtain his assent to certain legal proceedings. He saw Mrs. F., who referred him to F., who was lying in bed. Witness stated the matter to him, and he gave his assent. To all appearance, Mr. F. was in the same state then, as he was in May, 1827, when the will was drawn.

On cross-examination, Mr. Phelps testified, that when he went to draw the will, he first met with Mrs. Smith, the sister of Mrs. Fisher, who told him what he had been sent for, that Mr. F. was sick and weakly, but possessed his faculties to make a will. Mrs. S. was not present when the notes were taken down, or when the will was drawn, nor any one except Mr. and Mrs. F.

Witness cannot say the testator gave any instructions which were intelligible to him, unassisted by Mrs. F.'s explanations; which induced an extraordinary vigilance on the part of witness to get at Mr. F.'s meaning and intention. Mrs. F. would inquire of him how he wished to dispose of this and that property, and would repeat his answer to witness, who then put the question to the testator, who assented to it. This course was pursued with all the provisions of the will. Witness did not hear Mrs. F. dictate to F. how he should dispose of any part of his property, otherwise than that she mentioned his brother's little daughter, and said she ought to be provided for, and asked what he intended to do for her. Witness had seen the testator only once before this, and does not think his opportunity sufficient to enable him to give an opinion, on which the court could rely, as to the soundness of the testator's mind when the will was made. He discovered nothing in F.'s manner or conversation, which indicated a deranged mind. Instead of repugnance, he appeared by his manner, desirous to have the will drawn. He did not laugh as witness saw, but had a coughing fit, which was caused in part, as witness supposed, by a burst of feeling. Witness supposed his disease was palsy. He was in bed most of the time, and was assisted to get out of his bed into his chair by Mrs. F., and appeared very infirm. He signed the will without any aid, and sat up half an hour in his chair, no one supporting him; and witness left him sitting there. When applied to by witness, as to what Mrs. F. had said, he did not attempt to speak, but gave his assent, bowed his head, and witness understood and believed he said *yes*. Witness recollects that Mr. F. gave his assent in writing.

MATILDA JEWETT, for the defendants. Is one of the subscribing witnesses to the will, and proved its publication and her signature, as stated by Mr. Phelps. Knew Mr. F. twelve or fourteen years, and in her opinion he was of sound mind when he executed the will, and was so at all times when she saw him. He acted as if under no restraint, when he acknowledged it.

Cross-examined. Witness lived with her father and sisters, in the same house with Mr. F., but in distinct apartments, after May 1, 1826. During that time she sometimes went into his

room to see him, and asked him how he was. He would some-
times answer "better," and sometimes say he was not so well.
Occasionally when Mrs. F. was absent, she went to his room
and asked if he would have any thing to eat or drink, to which
he would bow his head and point to the closet or table, and some
times would shake his head. Shortly before his death, when
alone, he called her name distinctly, and she believes her sister's
name, wishing to receive some assistance. And within a few
months of his death, on her helping him to metheglin, he pointed
to the decanter, and told her to "take some." She thinks the
impediment in his speech, was owing to the soreness of his
mouth, as he spoke better at sometimes than at others. While
she lived in the house, she thinks the testator had capacity to
make a bargain, or to receive and pay money. Mrs. F. mana-
ged the affairs of his family generally, bought and paid, and
received rents from witness and her sister. He had not been so
well a short time before the will was signed, but at that time
was better, and as well as he had commonly been. The day
before his death, he was sitting up in his chair, and bowed to
her as she passed the door, and appeared to be as well as he usu-
ally had been. She knew of Mrs. E. Clarke calling two or
three times to see him, and a daughter of P. Clarke's, once or
twice. They were not ill-treated to her knowledge. The wit-
ness named eight or nine persons who sometimes called to see
the testator, within her observation.

WILLIAM CORNELL, for the defendants, saw Mr. F. sign the
will, and witnessed it. F. took up his pen and signed it, and
then acknowledged it. He appeared to be rational, and when
witness asked him how he was, he replied, very well. Has no
doubt F. was aware he was executing his will. Cross-examined.
It was not Mrs. F. who asked him to come in and witness the
will. The will was read over by Phelps to F., before it was
signed. Witness was in the room half to three-fourths of an
hour. Knew F. about thirty years. F.'s body was weak.
When he went out to take the air in a carriage, he was helped
out of his room into the carriage. When he signed the will, he
was no worse, and was much the same as he had been from the
1st of May, 1826, during which time witness lived in the same

Clarke v. Sawyer.

house. His speech was injured, but his intellects did not seem to be impaired. The rooms were hired by witness with the consent of Mr. F. His daughter, Mrs. Jewett, paid the rent.

DR. CHARLES BALL, for the complainants, knew Mr. F. fifteen or sixteen years. Attended him as a physician from May 3, 1823, till the last of July, and thinks he prescribed for him in 1824, and had ·a fair opportunity of forming an opinion of his mind. His apoplexy for a time deprived him of his senses, and left him very childish. His bodily health afterwards improved a little, but his mind became if any thing more childish. Witness thinks in the latter part of the time, his mind was such, that any one of his particular friends might persuade him to do what they pleased with his property, or to make such a will as would suit them. At times he had lucid intervals and appeared more rational. His mind gradually decayed while witness attended him, up to 1824. This opinion is formed from his crying like a child when spoken to, and his manner being like that of a child, rather than one having his faculties. He would change his former feelings like a child, on being told any thing to divert his mind. He seemed generally to understand the questions witness put to him, but did not try him on any complex questions. Had no occasion to put such, and should suppose he was not capable of answering them. Thinks testator's mind was not sufficiently strong to dwell long on any subject. Apoplexy leaves patients frequently childish, and occasionally idiotic, particularly the aged. Judged him to be about seventy. His complaint terminated in palsy. His brain was partially affected. His speech was very much impaired, though towards the close of July, 1823, it became so far intelligible that some words could be understood. Witness occasionally called on him as a friend, till shortly after his first wife's death, and perceived no difference in the state of his mind. The defect of speech entered with other things, into witness's estimate of the state of his mind. Cross-examined. Attended the first Mrs. F. in her last illness once or twice a day, and during that prescribed once for F. Witness recollects no subject on which he talked with F. except his complaints, but has no doubt he talked on other subjects. At first F. did not understand his questions about his health, but did at the

close of July, 1823. Does not recollect any conversation with F., or any answer given by him, from which he inferred F. was of unsound mind. Testator's palsy was not a decided case of *hemiplegia*; both hands and feet were affected, and one side more than the other. Palsy would affect the speech, although the mind might not be affected. As a general rule, the mind is weakened by the weakness of the body, but he has known instances of extreme bodily weakness, terminating in death, where the mind was apparently not impaired. The testator laughed and cried like a child. It is not unusual for persons to cry in extreme bodily weakness, though their minds are not affected, except by the disease; but it is not usual for persons to laugh in such circumstances.

J. V. E. VANDENHOEF, for the complainants. While Dr. Ball attended Fisher as a physician, witness went at his direction to electrize Mr. F., which he did from twelve to twenty times, during a period of a month. He concurred with Dr. Ball as to F.'s laughing and crying, and his childish conduct, and thought from the circumstances, his mind was impaired, but did not talk enough with him to judge distinctly. His speech improved during the time.

DR. MATTHEW WENDELL, for the complainants. First saw F. about ten days after his attack, in consultation with Dr. Ball and Dr. Post. Had previously known him as a man of strong mind. At that time, his mind was entirely prostrated, and his speech inarticulate. His attack was a severe one, and was originally on the brain. Such attacks affect the mind more than those commencing in the extremities. Old age usually has an unfavorable effect on the disease, but the aged will sometimes recover from a paralytic attack, after the brain has been affected, and be as sound as ever; but recollects no such instance where the disease was protracted more than three months. Witness visited testator a number of times, and saw him again but not as a physician, (and not more than two or three times,) in 1824, during his first wife's last sickness. He had then improved but little in body, and his mind appeared about the same as in June. He smiled vacantly and looked pleased, when witness shook hands with him. His smile indicated fatuity, and he was then incapable of

Clarke v. Sawyer.

understanding ordinary business in any degree. Thinks if his disease continued a year longer, it would be impossible for him to recover in a degree sufficient to transact ordinary business. Witness never saw him after his first wife's death.

Cross examined. Does not recollect speaking to F. except to say "how do you do," in 1824 ; nor that, on more than one occasion. His visits as physician, were within a month of his first attack. Apoplexy invariably attacks the brain, and it is common for persons to recover their faculties in cases of apoplexy. Palsy uniformly affects the nervous system, and it is uncommon for persons having palsy to recover entirely the use of their limbs. Witness has attended a number of cases of palsy, where the patients recovered, when the attack was *hemiplegia*, which always affects the brain. Does not recollect any cases in his practice, where the disease has continued more than six or eight months or a year, that the patient recovered.

DR. CHARLES ROWLAND, for the complainants.

Knew Mr. F. though not particularly acquainted with him. In March, 1827, witness rented of F. from the first of May, a house next door to the latter's residence. Made the bargain with Mrs. F. in the testator's presence. He took no part in it. She would say, Mr. F. will not agree to this and that, and turn and repeat the same to him, and he would shake his head and utter something which witness understood to mean *no ;* and to the propositions to which she agreed, she said to F. "you will agree to this," and he in the same manner assented. The contract was drawn up there. Mrs. F. dictated to witness and to the testator, and he in no instance disagreed with her. Witness saw the testator in all about seven times, and every time but once in bed. The last time was the end of April. Witness thought his mind was very weak, and that he was entirely under the influence of his wife, and that she could have induced him to execute any contract she pleased. Witness would have hesitated to take an obligation from him for any considerable amount, doubting whether it would have been good in law. Witness thought on the occasions he saw the testator, that he was not capable to make a contract without dictation or assistance. Observed the testator laugh and cry a number of times, but not without cause. In this he appeared very

childish, particularly his crying. Witness observed, and thought from the testator's countenance there was a want of intelligence. There appeared to be a rolling and staring of his eyes, more or less, which is common in palsy.

Cross examined. Witness cannot say whether the testator was paralytic. Was not called upon to attend him. If he had hemiplegia, his speech and nervous system would necessarily be affected. In severe cases of palsy, it is not uncommon for the patient to have a nervous affection, similar to hysteria, which causes convulsive motions resembling crying, on very slight emotions of the mind. Witness does not recollect any conversation with the testator, except to ask him how he did, and once more particularly as to his health; and he always answered in the negative or affirmative. Judged of his mind, not by what he said or did, but from his doing nothing except through the instrumentality of his wife. As to the latter, all the witness knows is in relation to his lease before stated.

ROBERT LOWTHER, for the complainants. Was employed as nurse for Mr. Fisher, from the first of June, 1823, to May 4, 1824. His bodily health was very poor, he could not walk, his speech was not good. Did not see him grow better or worse, while witness remained there. His mind was pretty weak. He could understand witness, and such subjects as telling witness to shave him and make his bed, but not all subjects. He said one night, that his bed was full of bricks, and people were walking through the room, which was imaginary, but he believed it next day. Witness was in the habit of applying a warm brick to his feet once or twice a night. He was childish, and when people come in, would laugh and cry almost in one breath. He did not transact any business. Mrs. Hawksworth would sometimes consult testator, and he went by what ever she counselled. She and Miss Rapelye, now Mrs. F., lived with him and controlled and managed his affairs. His first wife managed till after her death, and he was governed by them after that. Mrs. H., after his first wife's death, was frequently gibing him about getting married, asking him how he would like a young wife, to which he said he would like it if he was well and in good health, but

allowed he was in a poor state for marriage. Witness has seen Mrs. H. and Diana rub him, as witness had done to remove his pa'n, by putting their hands under the bed clothes. Sometimes they rubbed when testator did not complain. Does not know what part they rubbed. Diana very seldom went into his room, until two or three weeks after the first Mrs. F.'s death. The latter insisted on her coming in, but F. objected. Mrs. H. after her death, told F. it would be better for Diana to sit in the room and knit, and keep him company. After she first come in, Diana was there four or five times a day, and before witness left, was there as much as he was, leaving nothing for him, she ordered everything. Mrs. H. asked witness in the presence of Diana and F., how it would do for them to marry. Witness answered it was against the gospel for a man to marry his wife's sister. Shortly after this, witness left. He saw that Mrs. H. and Diana, were working a plan that he should not be there to hear their conversations and actions. He heard them say that too much of F.'s property had been left to Mr. Clarke's people by the second will. About four weeks after the first Mrs. F.'s death, F. having occasion to be angry, had been scolding, and on witness complaining to Diana, she said, "would you mind him? He is crazy and will never be well." She said the same thing more than forty times, while witness was there. Testator was easily excited to anger and easily pacified. Mrs. H. tickled his feet and livened him up frequently, and spoke to him about getting married, and asked him if he would not like to have a wife; to which he sometimes said *yes*, and sometimes *no*. Mrs. E. Clarke, the first part of his illness, was there to see him three or four times a day, but afterwards less frequently, she thinking, and as witness observed, there was no countenance shown to her in the house. Witness heard Mrs. H. and Diana say before F., that she came there to make a bother, and more for his property than from regard to him. During the warm weather, testator was very careless of exposing his person indecently, by kicking off the bed clothes, at which he would laugh. This was in the presence of Mrs. H. and his first wife. Witness would cover him, and he would again kick the clothes off, and then they would laugh with him. He could use only one leg at a time in kicking. He could not use a knife

or fork. Witness fed him like a child, and sometimes Mrs. H. did. Heard Diana tell Mrs. H., he was not fit to marry, he was a helpless man. Never heard her say any thing to the testator about getting married, except that she once told him if he was married he would get well. Heard Mrs. H. in her presence, frequently speak to him about getting married, and told him he would be well enough, if he would get a wife and spry up, and go out riding. Never saw Diana take hold of him to kiss him, or use any endearment to him. Testator was not in a situation fit to be married, no more than a dead man, for he could not move himself in bed without help. Witness saw no other reason than than that he was so helpless. To the best of witness's opinion, his mind was as unfit as his body. Some things were purchased by Mrs. H. which he rather objected to. His mouth had been well four months when witness left. His difficulty of speech was not from that. There was no difference in his speech, while witness stayed. His face was twice distorted. Dr. Ball called it a fit. Witness saw him twice, just after his second marriage, Saw no difference either in body or mind, but he had only short conversations with F.

Cross examined. Mrs. Hawksworth came there to live in the summer, and Diana in the fall or winter, after witness came. The first Mrs. F. died March, 4, 1824, after which the family consisted of Mr. F., Diana, Mrs. H., the witness, and Sarah Ann Ryder, a servant who was there when he came. Witness's wife came and occupied the front office for a few weeks before he left. Cannot tell whether F., Diana or Mrs. H. dismissed witness. Diana said he got too much wages. Mr. F. told him he ought to get up earlier in the morning. Mrs. H. thought he ought to stay, and made no complaint. Witness saw J. B. Clarke at the testator's, but not as often as Mrs. C. Was there when F. made one will, after the first Mrs. F.'s death. When Doughty drew it, there was to be no one in the room except with him and Mr. F. Mrs. H. had the payment of the money and kept the keys after Mrs. C. F.'s death. It was usual for her to consult F. when she was going to pay money, and about small matters, but she did not altogether consult him. Has heard her consult him about purchasing some such things as wood for the winter. · She

did not consult him about a large bill made for dry goods on Mrs. C. F.'s death, which was partly for her funeral. Mr. F., objected to this bill, said it was too much, there was no occasion for so much expense. He was offended at the purchase and its amount, and told Mrs. H. he never authorized her to get those goods. No other purchase of hers was objected to. Diana neither said nor heard any thing about this purchase of goods. Witness had very little conversation with testator after he left his house, and don't remember as he spoke a word to witness. Witness heard sharp words between Mrs. H. and Mrs. E. Clarke, on occasion of the latter's saying the testator's linen ought to be shifted oftener. Never heard any between Diana and Mrs. C., or any rudeness, offensive remarks, or incivility. Saw no difference in testator's mind while witness was there, except the night when he spoke of the bricks &c., and he was better after that. His mind was no better after his first wife's death, than it had been during the previous part of his illness. On direct examination. The testator's speech was altogether in broken sentences, and not intelligible to strangers.

ROBERT BOGARDUS, a counsellor at law, testified to the testator's appearance and conduct on three occasions when he visited him on business; the first just after his attack, the second about July, 1823, and the third a few months after. He obtained a payment of $250, the first time, and $500, on the second visit, from those in charge of Mr. F. According to his testimony, Mr. F. was in a palsied, helpless state; his speech and his intellects much affected, and his manner puerile and foolish. The first time, witness was satisfied that he had no capacity to understand any business, and his mind was not improved when he last saw him, so far as the witness discovered.

Similar evidence of the testator's condition after his first attack, and during more or less of the time prior to his first wife's death, was given by several other witnesses on the part of the complainant.

ISAAC NICHOLS, for the complainants, knew Mr. F. intimately for twenty years. He was a man of strong argument and sound mind. Saw him five or six times after his illness, the last time about February, 1827. Thought him of very unsound mind,

and always found him in the same situation of mind and body. Mr. F. could not articulate a single word, so as to be understood by witness. Never attempted to converse with him on any subject, except to inquire after his health. Judged he was not in his sound mind, from the fact that he would take hold of the witness's hand, and continue to hold it, and would laugh and cry at the same moment. There was no other fact or circumstance for his conclusion. Witness is over seventy-eight years old.

JOSHUA SANDS, for the complainants. Knew the testator from the year 1780. Saw him twice after the first Mrs. F.'s death, and frequently before that, during his illness. When first taken, he was a little conversible, but grew weaker and weaker. Seemed to be incapable of argument as usual on political subjects, but seemed to be pleased and to understand the matter, when witness spoke about a bank to be established in Brooklyn. This was in 1823 or 1824. After he married Diana R., witness called on him, on behalf of a tenant, to surrender a lease. On addressing F. he made no reply, but Mrs. F. without consulting him, made some remarks refusing the request, and then turned to him and asked if she was not right, and he answered *yes, yes*, loudly and very distinctly, and then turned his head from them. Thinks the testator understood the matter. On being sent for to bring F.'s will, left with witness, he found F. sitting in an easy chair, and handed the will to him. He said *I thank you sir*, twice, and spoke it distinctly. Mrs. F. was there, but took no part in the business. Witness judges the force of his mind was gone, and he was incompetent to form just conclusions in any thing complicated. If a matter of interest to him, was put to him slowly and distinctly, by giving him time, he could judge of it pretty correctly. Cross examined. In what witness says as to mind, he refers to the period before Mrs. C. F.'s death. Was present just before that event, when F. executed a will. J. B. Clarke and the family generally were present, and he made no objection to F.'s competency to make a will. After his second marriage, F. introduced his wife to witness on his first visit, by saying " Mrs. Fisher." Re-examined. From six to nine months after his attack, the first Mrs. F. consulted witness as to F.'s mak-

ing a will. Witness then doubted his capacity to make one, but on going to F.'s, found several of the family collected, Mr. and Mrs. Clarke, Mrs. Smith, Mrs. H., Mr. Vanderveer, and he thinks Diana. Conversed with F. who spoke better than afterwards. A will was prepared, read and fully explained to him, and executed. This on reflection, was after the first Mrs. F.'s death. Some of the females, (not Mrs. C.) made disturbance, being dissatisfied with it, and were requested to retire.

ALDEN SPOONER, for the complainants. Knew Mr. F. sixteen years. In 1824 or 1825, called on F. to pay interest on a mortgage. Paid it to Mrs. H., who gave a receipt. She showed F. the money, and said, there is sixty dollars, and he assented by a nod. Attempted to converse with F. on village affairs, but it was ineffectual. Supposed his mind was gone and entirely imbecile. About a year after, called and paid $1000 to Mrs. F. in his presence, but without his direction. Only inquired of him as to his health. His countenance was bad, particularly about his eyes. Thinks he had not sufficient mind to transact business then or subsequently. Seemed to assent always to what Diana and Mrs. H. said, and to answer *yes* or *no*, as Diana dictated. In February, 1827, witness called to solicit from F. donations for the Greeks, and also for the poor of Brooklyn. Heard nothing from him except his assent by a nod, to Mrs. F.'s proposal to give two dollars. He attempted to speak, but witness could not understand him. Thinks Mrs. F. consulted him as to the object of the donation, and he said something in answer. Testator's countenance appeared void of intelligence, and at one time he appeared to laugh and cry. Cross-examined. Does not know as Mrs. H. expressed any opinion to which F. assented. Or that Diana did, on either of his three visits. When there in 1825, she told witness F.'s health was better.

D. WRIGHT, for the complainants, called with Mr. Spooner to solicit donations for the Greeks. F.'s wife asked him if he would give for the Greeks, or the poor of Brooklyn. He answered through her, he would give two dollars for the latter, and nothing to the Greeks. He cried as he laid in his bed, and tears ran down his cheeks, appeared to be childish and foolish, half laughed and half cried.

A. TITUS, for the complainants, saw the testator four times in the summer of 1826, and twice helped him into his carriage. He could not talk so that witness could understand him, but mumbled over something, and he cried without any apparent cause. Witness thought him as unfit for business as a child.

F. HOPKINS, for the complainants. Is secretary of the Brooklyn Fire Insurance Company, which had an office, about three years before his death, in the front part of F.'s house. He paid the first two or three quarter's rent to Mrs. H., and took her receipt for F. For the next two quarters, has the testator's receipts. Once was asked by one of the family, to go up stairs and see F. destroy a paper. Went up and saw him sitting in his chair, tear a seal off a paper. Mrs. H. and Diana were there. Not a word was said by any one. Could not understand F. when he attempted to speak. In June, 1827, noticed that his tongue was blistered.

H. W. CADY, for the complainants. Saw the testator once in the winter of 1827, while doing joiner's work at his house. Conversed with him, F. could not speak distinctly. Thought he was not in his right senses. Witness thought he was not well attended to, from the appearance of his room and clothing. Saw him again after his death, and laid him out. Found his corpse in a neglected state.

THOMAS LAWRENCE, for the complainants. (The deposition of this witness was taken down by the surrogate in the usual manner, and he refused to subscribe it after it was completed. The defendants objected to its being read for that cause, and a like objection had been taken before the surrogate. It was read subject to the objection.) He testified he was very intimate with the testator. Saw him frequently in the early part of his illness, occasionally after his first wife's death, and once just after his second marriage. Thought he was much under the influence of Mrs. H., Diana, and her sister Mrs. Smith. Did not converse with testator about business, as he thought he was not capable to understand it. He looked very different from formerly, had a vacant look of the eyes, and he could not converse. Did not always appear to know witness. Does not remember seeing him cry or laugh during any of his visits. Discovered no differ-

Clarke v. Sawyer.

·ence in his mind ·while he visited him, and cannot tell whether it grew better or worse. Cross-examined. While F. was very ill, in his first wife's time, there was some dissatisfaction on her part, as well as Mrs. E. Clarke, as to F.'s will; and witness brought them together, with a view to an amicable arrangement as to his property. Witness thought there was no will and there ought to be one, and that one might be made, if the two heads of the family could agree.

Rev. H. U. Onderdonk, for the complainants. Mr. F. was a communicant of St. Ann's Church, Brooklyn, of which witness is rector. Called to see him several times during the first two or three months of his illness, as his pastor. Saw him again during Mrs. C. F.'s last sickness, and once or twice after his second marriage. ·Attempted to converse with him, principally on religious subjects. Succeeded very imperfectly, owing as he thinks, to F.'s imperfection of speech, and the prostration of his intellects; and also because Diana Rapelye would reply, sometimes after speaking to F., and sometimes without. Witness regularly pursued medical studies, and practised as a physician four years in the city of New York. The state of F.'s mind was such when witness visited him, that he should have deemed it highly dishonorable to have made any bargain or contract with him, unless his friends representing his interest, had been present and assented. Nothing occurred at witness's visits to show that F. was under Diana's influence, or whether he was or not. Suspended his visits as well on account of her interference, as because he thought F. from the state of his mind, incapable of deriving benefit from conversation with witness. At ·the two last calls made by witness, the testator's mind appeared to be in the same condition as before his first wife's death, and not at all improved. If the testator's friends had requested him to be married for his own benefit, witness might have been induced to perform the ceremony, but otherwise would have declined on account of the imbecility of his mind.

Cross-examined. Visited F. frequently during the first two or three months of his illness, then seldom till the first Mrs. F.'s last sickness; is not sure of but one visit then, and after that has no distinct remembrance of seeing him till after his marriage,

Does not recollect any remark or question addressed by him to F., during or after the first Mrs. F.'s illness, which required an answer, and to which he gave none.

Direct examination. Stayed ten or fifteen minutes at his visits, and on each attempted to do his duty to F., as a clergyman, and was satisfied that the attempt was vain. Recollects now, Diana's interference was after the first Mrs. F.'s death. His remembrance of dates and times in this case, is imperfect.

John Pintard, was a long time secretary of the New York Historical Society. Testator for many years, when witness met him and opportunity served, was in the habit of relating the story of his purchase of the papers of Lord Stirling, which is referred to in the testimony of Dr. Watts, for the defendants. He was fond of dwelling on the subject, and considered it a pretty important epoch in his life.

Cornelia Park, for the complainants. First saw testator about six months after his last marriage. Once after that, saw him at Mrs. Ann Smith's at Bloomingdale, near where witness resides. He was then carried from one room to the other to eat his dinner. Did not hear him speak a word, and he did not appear to take much notice of things about him. Believes he noticed the conversation, and laughed at times when they were joking. Has not an opinion whether he was rational or not, as she did not hear him converse. Was at his house and saw him the day the last will was made. Did not speak to him, because Mrs. Smith told her in F. and Diana's presence, that he was too low to be spoken to. Diana said she did not wish any one to speak to him, because he was too low. She and Mrs. S. both told witness they did not want it known he was so low, because the house would be run down with visitors, and asked her not to mention it. Mrs. S. told her, he had made his will that day, and requested her not to mention it; and she repeated both requests as witness was leaving the house, and told her she expected he would die soon. Witness however mentioned it the same day at her son's in Brooklyn, and she believes it was soon known over the village. Mrs. Hawksworth is insane, and has been since 1825.

Elizabeth Denyse, for the complainants. Knew F. about

twenty years. Mrs. Hawksworth is the daughter of Mrs. Ann Smith. Knew her and her mother and Diana intimately, and exchanged visits with them frequently in 1824 and 1825, while she kept house for Lawrence Fisher. After Diana's marriage, she said now she was married, they wanted a new will, the old one was done away, it was good for nothing. Diana, two or three times, urged Lawrence to coax his brother to make a new will to cut the Clarke's off, as by the old one they got all. The other females made similar applications to Lawrence. Saw the testator frequently during 1824 and 1825, and once in June, 1826, and frequently talked to him. Sometimes he would answer *no* by shaking his head, and *yes*, by speaking it indistinctly, but generally would take no notice of her. Thought he had no more mental capacity to transact business, than an infant. Diana and Mrs. H. appeared to control every thing, and he agreed to whatever they said. Witness bought provisions for the house, by their direction. F. seemed to care nothing about the purchases, or to understand any thing in relation to them. About six weeks before Lawrence was married, witness went over to tell F. and his wife that L. was wild, and was destroying his property. F. took no notice of it, and Diana told her in his presence, it was none of her business, let him spend it. The woman who married him was present at F.'s. L. was still deranged the day he was married. Diana before that, while he was deranged, told him to get married, that she had a young woman as a wife for him. Left L.'s house just a week after his marriage. (The testimony about the suppositious child is omitted. This witness signed her deposition by making her mark.)

C. M. Hempsted, for the complainants. Robert Lowther has been in his employ a year or two as a laborer, and so far as witness knows, he is honest, sober and true, and has never suspected him of want of veracity. He has twenty to forty hands, and has no acquaintance with Lowther, except as a workman in his employ.

Samuel James, for the complainants. Was a director of the Brooklyn Fire Insurance Company in 1824, and called with Judge Furman, as a committee, on testator, to rent his house for the company. The women present said he was too sick to attend to

business.  They thought two rooms could be had, but could not say then; the matter would be talked over, and they would let the committee know.  Was there fifteen minutes.  F. cried when witness took him by the hand.  Had no conversation with F., and Judge Furman had very little.  F. looked like a very worn down and feeble man, not calculated to do business, and witness says incapable of attending to it.  His utterance was poor, though witness understood him partly.  He showed no interest in the object of their visit.

Cross examined.  Judge Furman conducted the conversation principally, and the answer was to be given to him.  This was in April, 1824.

John Garrison, and Joseph Moser, for the complainants testified to Lowther's good character.  They saw him a good deal, but had little intercourse with him.

JOHN F. LAWRENCE, for the complainants.  Knew the testator from boyhood, and saw him a day or two after his first attack, when he was very low, and repeatedly during that year, and till December, 1824.  During this period, frequently conversed with him.  It was difficult to understand yes or no in his conversation.  Sometimes he would know witness and there was a little animation in his countenance.  At other times, doubted whether he knew witness.  Had no long conversation with him, because witness judged him incapable of conversation; it being difficult to understand him, and he not appearing to comprehend witness's questions.  Did not attempt to converse with him after the first two or three times.  Testator did not appear to be as well, or to articulate as well, at the close of witness's visits.  On the 17th of December, 1824, called to collect $100, money lent to testator's wife, during the first of his illness.  He was sitting in his chair.  Explained his errand to the females in the room, and Diana then explained it to the testator.  Thinks he said yes; a check was filled which he signed, and it being difficult to read his signature, Mrs. Hawksworth altered it so as to make it more legible.  The testator did not say any thing, or appear to take but little notice of what was going on.  Witness thinks he was childish or very like it.  Took particular notice of him on these visits.

Clarke v. Sawyer.

Cross examined. Is a cousin of Mrs. E. Clarke. Drew his conclusions as to F.'s mental imbecility, not from any thing F. said, or did, but from his bodily appearance, his countenance, the wild vacant stare of his eyes, his laughing and crying, and his not appearing to comprehend what was said to him. He was incapable of articulating intelligibly. Thinks he was not so well in December, 1824, as he was shortly after his first attack, and he did not articulate so well. The witness T. Lawrence, is the brother of deponent.

N. J. STILWELL, for the complainants. Saw testator once during his illness, about August 1824, and then for twenty or thirty minutes or less, being in a hurry. Had very little conversation, and don't remember what it was about. Thought him unable both in body and mind, to do his own business, and that he had not mental capacity to make a bargain or a will. Testator was in bed, and witness was talking with the other members of his family.

DR. JOHN WATTS JR., for the defendants. Knew the testator a number of years, by sight only. Saw certain papers in the library of the Historical Society, which had belonged to witness's grandfather, Lord Stirling, and which it was said had been obtained from testator ; and in July or August, 1826, called on the testator to learn if there were any more of those papers. Found him sitting in his chair, he received witness with politeness, and excused his not rising on the score of sickness. Observed his altered appearance, and remarked some distortion of face, and difficulty of utterance, with the flow of saliva from his mouth. Made known the object of his visit, to inquire as to Lord S's. papers. Testator promptly replied, he had them not, he had given them (and then hesitated a little,) to John Pintard. Witness asked if it was not the Historical Society. He said "they went there, some of them." Then added, "I gave some of them," here he hesitated again as if recollecting, "to a gentleman in Jersey," stopping again, and then added "to Governor Ogden." Witness asked if he gave many of them, or what proportion to Gov. Ogden. He said "he could not say," adding, "but such papers only as related to Jersey." Witness said, "you

do not recollect whether you gave him many or few?" to which he answered "yes I do, I gave him a silk handkerchief full." He said *not*, in answer to the inquiry if he had any papers remaining in his possession. Witness asked him if he might inquire in what manner he came in possession of those papers. Testator said, " he was passing in the street in New York sometime ago, and observed at a little auction a trunk put up for sale with papers and things in it: he was induced to examine it, and discovered to whom they belonged, and bid for the trunk, and for a few shillings got the trunk and all that was in it: that he had *had them for a long time in his house, till somebody made some* inquiries respecting them." He then stated those inquiries, and what led to them, and what disposition was made of the papers. He then observed " a gentleman called on me sometime ago concerning these same papers, and was anxious to know whether I had any more of them." He could not recollect who it was. On witness suggesting, was it Gen. Wilkinson, he immediately assented. He closed the conversation by saying, " I have told you now all I know about it." Was with testator at least half an hour, and was struck with the retentiveness of his memory and the promptness of his answers. There was hesitation and embarrassment in his utterance, and nervousness in his manner ; but witness distinctly understood him, and did not find it necessary once to make him repeat what he had said. Testator was evidently paralytic, and witness could not help remarking the retentiveness of his memory, because of his shattered appearance. He did not laugh while witness was there, he wept once or twice, and by his manner apologized for it and intimated he was conscious of his situation. Weeping on a slight agitation, is a symptom of this complaint. Weeping is decidedly a bodily affection, but not exclusively, the mind is always more or less affected.

Cross examined. Had never conversed with the testator till this visit. He was capable of uttering a whole sentence, and a short one continuously ; but would pause occasionally, if it was a long one. His speech was better when alone with witness, than it was when his attention was attracted by a person's passing through. Witness has seen one attacked with apoplexy, and

insensible for five or six days, and when revived was perfectly helpless, and could not articulate, who improved so far, that at the end of a year or more, he could walk about, articulate pretty distinctly, help himself nearly as usual, and appeared to have recovered in a very great degree, from the impression made on the intellect. It is not unfrequent in these cases, that the moment of greatest amendment, is the moment of greatest danger of another attack. It is a general principle that debility of body enfeebles the mind, but witness has known paralytic patients who have been for years helpless and unable to walk, yet retain a considerable share of judgment, memory and the other faculties of the mind. And he has seen instances of paralysis, where the mind has improved and the body continued much the same. Such cases are not unfrequent. Witness's opportunity to ascertain the state of the testator's mind, was nothing like equal to that of an attending physician. He exhibited the fluctuation of feeling usual in paralytics; their feelings are easily excited. From witness's observations, testator's mind appeared to be a great deal better than he should have expected from his bodily health. Could not see him without associating the idea that his mind was shattered in common with his body. Paralysis always affects the mind more or less, and witness was surprised to find his mind so much better than he could have expected. Weeping in these cases is properly an hysterical affection, and implies a diseased state of both body and mind. Being asked whether this also implied in the testator's case, the witness answered yes. Direct examination. But the witness does not mean to say that the weeping in the testator's case, implied such a disease in the mind as would render him unfit for business.

Dr. James Cameron, for the defendants. Was called as a physician to visit testator during his illness, twice in his first wife's life. Attended him a number of times after her death, and before his second marriage. After that continued to visit him until April, 1827, but not as regularly as before. On his first visits, could not understand the testator. After the death of Mrs. C. F., could understand him generally, and latterly, understood him perfectly. During his first visits, Mrs. Hawksworth explained what he said. From the time witness could understand

testator, has no doubt that he was of sound mind. He never said any thing to witness which induced witness to suspect his mind was otherwise than sound, or which indicated a want of mind. When witness saw him in April, 1827, his health seemed better than witness had ever seen him before ; he was in good spirits, and conversed freely on any subject which was stated.

Cross-examined. Did not see F. on his first attack. When first saw him, his disease was general paralysis, and he seemed to be affected all over, so as to overcome the nervous system. Became his attending physician soon after the first Mrs. F.'s death, though visited him twice before. Paralysis may or may not affect the mind. Testator's mind was not diseased, so far as witness could perceive, but when the body is severely affected, the mind is less strong than in health. His mind was not any more affected than it would have been in any other disease where the body is equally affected. Never saw testator cry. He usually smiled when witness came. Does not recollect to have heard him laugh out loud, unless something jocular was said. Thinks his impediment of speech, was owing to the want of action of the nerves of the tongue, occasioned by paralysis.

Susan J. C. Martin, for the defendants. Knew Mr. F. over thirty years. Saw him in May and June, 1827, and had frequent conversations with him. Spent two afternoons with him, from about noon till near dark, during which he was polite enough to sit up. He appeared to speak intelligently. Witness has not the least shadow of doubt but that he was in his sound mind. His speech was much broken, and his tongue very sore, there being a blister on its side, the size of a pea. He showed it to witness, and he spoke with great difficulty, though she understood him perfectly well. He told her he was happy that he had married Diana, as she was very kind and attentive and good to him.

Cross-examined. Witness's mother and Mrs. Fisher's were intimate, and witness was intimate with both the Mrs. Fishers. Has known the present Mrs. F. thirty or forty years ; they were girls together. Mr. F. seemed infirm, but eat hearty. He conversed with as much intelligence as he ever had.

Hannah Pierson, for the defendants. In the spring of 1826,

for between two and three months, was a part of testator's family, eating with them, and passing the day time principally with him; his bed room being the common family sitting room. Frequently conversed with him. When conversing with Mrs. F., he would occasionally join. At times he spoke indistinctly, but witness could always understand him. Strangers could not always, and witness frequently was obliged to explain to them what he did say. His conversation was quite rational. There was not the slightest appearance of unsoundness of mind in him. He was fond of speaking of the revolutionary war, and related a great many anecdotes of it. He was fond of speaking of his property, and told witness how he first made it; spoke frequently of his lands in the neighborhood of the canal, and occasionally of his stocks. He would occasionally shed tears, when speaking of persons with whom he had been intimate, such as his wife and daughter, and officers in the revolutionary army. Never saw him laugh in a childlike or foolish manner. Was frequently at his house, both before and after that stay, and was intimate there till within a few weeks of his death. Saw F. the last time in May, (1827,) and was there about an hour, when she conversed with him. Saw nothing in his manner or conversation which induced her to think his mind was unsound. Visited there in the life time of his first wife.

Cross-examined. Saw and conversed with F. twice before his sickness, and perceived no difference in his mental capacity after that. Thinks it was as good when she last saw him, as when in health. Thinks he could converse on any complicated subject during his illness. He would converse freely with those he liked, very little with others; there was a very perceptible difference. He gave directions as to all his family concerns. Mrs. F. could do nothing without consulting him. Witness was living in New Jersey, and did not see testator during the first year of his illness.

Re-examined. Understood from F. he had been in the army during the revolutionary war. Her acquaintance with him before his illness, was slight. His tongue at times was very sore, owing as she understood to the medicine he took, and at these times his speech was more indistinct than at others.

JOSEPH DEAN, for the defendants. Is a commissioner to take the proof, &c., of deeds, in Brooklyn. Some time during the last winter, (1827,) James B. Clarke handed to him two deeds, and desired him to take the testator's acknowledgment of their execution. Went with the deeds to the testator. His wife was not at home; found him alone. Told him Mr. Clarke had handed witness the deeds, and wished him to take the testator's acknowledgment. Testator being in bed, took the deeds, and appeared to be reading them for some minutes; his hands trembled considerably. He handed the deeds back to witness, and said to witness, "You read it." Witness took them and read them audibly, and in reading made some mistake which he noticed. After they were read, he said "That is right." Witness being somewhat impatient, waiting for Mrs. F., whose acknowledgment he also wished to take; F. said something about her returning soon, asked witness to sit down, and asked about his family. Witness said a good deal to testator, on purpose to ascertain the state of his mind, and the result was a conviction on witness's mind, that testator had his senses, and knew what he was going to do, and understood the nature of the instruments he was about to execute. If witness had not been so convinced, he would not have taken his acknowledgment. After about three-quarters of an hour, Mrs. F. came in, and the deeds were then executed and acknowledged. Testator then said something about procuring certificates from the county clerk, the lands being out of Kings county. Nothing had been said to lead to this suggestion. Within two years prior to this, witness was sent for to come to F.'s house, to take the acknowledgment of two deeds to the testator, which were executed in his room by Miss Bowles, and he thinks another person.

Cross-examined. He has heard Mr. Clarke say, but he cannot tell whether before or after these deeds were executed, that they were in fulfilment of an old contract. Mrs. C.'s son, Edward, was present, he thinks, when the deeds were handed to him. About a year before that, witness took the acknowledgment of another deed from testator, the necessity of a county clerk's certificate to which, was mentioned by witness in his presence. Knew him before his last illness. He was then a smart man,

Clarke v. Sawyer.

Does not know but by disease his mind may have been weakened. He was unsound in body, and should think his mind might be somewhat weakened, but thinks he was perfectly sane.

The deed the year previous, was in fulfilment of an old contract executed by the testator. On its execution, had a conversation with him; does not recollect its substance, but what he said was perfectly rational. He spoke with some difficulty, and sometimes had to speak it over twice, but witness could understand him. Recollects that on leaving him on that occasion, witness shook hands with him and he cried. On signing the two deeds handed by Mr. Clarke, testator found it difficult to write his name, and as he was finishing his signature, he burst out a crying; which witness thinks arose from his mortification in not being able to subscribe his name with ease. Re-examined. Had no doubt but that the testator was perfectly competent to execute a deed, when witness took the acknowledgment the year previous. Would not have taken it, if he had had the least doubt.

SAMUEL JARVIS, for the defendants. From May, 1825, till testator's death, visited the testator, sometimes once a month and sometimes two or three times a week, as convenient; always conversed with him, and testator became intimate and friendly with witness. At first understood his speech only partially, afterwards learned to understand him well, but some words were difficult to be understood. He conversed with witness about bank stock sometimes, and when the different banks broke, he inquired of witness in relation to them, and asked him several times if they were got a going again. In the spring of 1827, F. had bought a lot, the location of which was to be ascertained by drawing for it, and Mrs. F. desired witness to attend to the business for her husband, and asked him if he would send the money for the lot by witness. He answered " no, he had paid for it already, and was not going to pay for it over again." Mrs. F. who was in a different part of the room, asked him what he said and he repeated it in substance, loudly and so distinctly that witness plainly understood him.

On his different visits, witness remained with the testator, sometimes an hour, sometimes an hour and an half; and several

times spent the greater part of Sunday afternoons. Always found the testator rational in his conversation. Never discovered any unsoundness of mind in him, to the best of witness's knowledge. Used to converse with him on a variety of subjects. Believed from what witness saw of testator, that if his health had permitted and he could have gone abroad, he would have been as capable as witness of transacting business.

Cross examined. Testator in uttering long sentences, or long syllables, would stop as though he had an impediment in his speech. He was very feeble in body, and was lifted in and out of bed during all witness's visits. Never saw him help himself to any thing, except once when he took a newspaper off a stand, and asked witness to see if there was any thing about the price of stocks. Sometimes he would say to Mrs. F. " my dear, you talk too much." He was more unwell at some times than at others. The worst witness ever saw him, was three or four weeks before his death, and on inquiring how he was, he told witness he was worse, and afterwards put his hand on his heart and said " he had a great deal of pain there," and he screamed out several times while witness remained. Discovered no change in his mind at this time. He appeared more unwell from the first of May last, (1827.) After that he appeared short of breath when he laid down on his back, and would be helped up into his chair sometimes two or three times while witness stayed ; at other times found him sitting up, and he would continue up while witness remained. Has seen a gold piece which he wore in his stocking, and was told it was to draw the mercury out. This was mentioned in testator's presence. Testator conversed as freely as a man could do, who had been lying sick so long, and witness could not discover the least defect in his understanding. The subjects were generally on money concerns. Testator told witness last summer (1826,) he had several times rode out, and that some accident happened on one of these occasions. Does not recollect the particulars.

WILLIAM FURMAN, for the defendants. Is president of the Brooklyn Insurance Company. Knew F. from thirty to forty years. In April, 1824, hired a room in his house for their office. Called on F. with the object of hiring the whole house; intend-

Clarke v. Sawyer.

ing the secretary to occupy all but the part wanted for an office. Testator objected to renting the house, and said he would not move out of it. Witness told him the situation was very desirable, and he wanted it very much. Testator wanted to know how it was to be occupied, and witness said for an office for the insurance company. He asked whether the lower front room (in which they then were,) would not be sufficient. Witness told him it would not; the directors would meet frequently, and would want a spare room. He inquired how often their meetings would be. Witness told him, once a month regularly, and sometimes more frequently. He then stated he would let them have the front room, with the occasional use of a back room, which he called a parlor; and then asked what rent they would give. Witness told him, he must set a price, and if reasonable they would give it. He hesitated, as if not prepared to give an answer, and asked witness if it was necessary that he should give an immediate answer. Witness told him it was not, and he might make up his mind and let him know next day. He said he would make up his mind and send him word. Witness said he would call and receive the answer, and the testator appointed a time next day for that purpose. Next day witness called, and F. told him he had made up his mind to let them have the rooms. After some conversation he named the rent, $150, to which witness objected as too much. He said the bank being there, it would be the best location for the insurance company; and after some other conversation as to the location and price, he told witness the company should have the rooms at $100, a year, and witness agreed to those terms.

Cross examined. Testator was reputed to be a man of easy circumstances, but not of large property. When witness rented the rooms, a Mrs. Hawksworth was present. Mrs. Diana F. was not present. When he first called, he sat there some time, and saw it was with difficulty the testator spoke; and witness did not at first understand him, but afterwards understood him perfectly. He took hold of witness's hand and held it some time, and seemed very much affected. This was the first time witness had seen him since his illness. Mrs. H. during the conversation made some remarks about the furniture in the back room,

and asked if it would not be injured. The testator laughed, and said he was not afraid the furniture would be hurt. After this, witness occasionally helped him in getting in his carriage when he went out riding, but had no opportunity to ascertain the state of his mind.

SARAH ANN RYDER, for the defendants. Lived about four years in Mr. F.'s family, up to ten days after he married Diana. After three weeks of his illness, she could understand his speech perfectly. He would hesitate in his speech, as if something stopped it. He could understand what was said to him, as well as witness could. He talked but little, except when spoken to, and then he would always answer and talk. When he was well he talked but little. After his speech became intelligible, she never discovered any appearance of his mind being unsound. His answers to the questions addressed to him, were always rational ; she never discovered any thing to the contrary. Mrs. Hawksworth managed his family from Mrs. C. F.'s death, until his second marriage. Upon that marriage, he directed Mrs. H. to give up the keys to Mrs. F., saying it was her place to take charge of the family. Mrs. H. always consulted him before she bought articles or paid money. He was dissatisfied with Robert Lowther's conduct, and more latterly than at first. Lowther was hired at a dollar a day to take care of testator and help around the house. He used to ask to be absent an hour, and stay away half a day, for which testator found fault with him. Lowther was disobliging about the house, and would get mad if asked to do any thing out of the sick room, and finally testator dismissed him. Never knew testator to visit Mr. Clarke's family, before or after his illness. Witness used to go into his room several times a day, and sometimes when Lowther was out, has sat with him a half hour or more. Sometimes took her work and sat there to sew.

Cross examined. Discovered no difference in testator's mind after his sickness from what it had been before ; it was equally strong, and knows he was as sensible as before. Could not see but his memory was as good. After the first three weeks, could not discover but that he talked as sensibly as he ever did, but not so easily, as his speech was not as distinct. He always con-

Clarke v. Sawyer.

versed with any person who came in for the purpose of conver-
sing with him. Witness was every day in his room, back and
forth. After those three weeks, he had no difficulty in making
any person understand him. So far as she observed, his mind
was not in the least affected by his disease, after that time. Has
seen him cry when his friends came to see him, whom he had
not seen in a long time. Never saw him laugh or behave child-
ish. Mrs. H. told her in testator's presence, about three weeks
before his marriage with Diana, that it was to take place. Has
heard Mrs. H. speak to him on the subject, but never heard her
recommend the marriage. Witness was present at the marriage
with Mr. and Mrs. Rose, Lawrence Fisher and Mrs. H. and the
minister; no one else. Knew Lawrence F.; he used to be there
almost every Sunday P. M., and often once a week besides.
Has heard him converse there often. Saw nothing to the con-
trary but that he was in his right mind. No other persons
than those named, were invited to the wedding. Testator said
he did not want to make a wedding, but to have it private. Mr.
and Mrs. Rose lived in one of his houses; she had been a domes-
tic in his family, and was married in his house before his ill-
ness. Testator was sitting in his chair when married; he had
been up all day. Witness never saw the Rev. Dr. Onderdonk
there but four times, twice before his last illness and twice after.
Witness complained of Lowther to testator; never heard Mrs.
H. or Diana. When witness left, there was a black man there
to take care of testator, who had slept in his room. After the
marriage, Mrs. F. slept with her husband, and as witness thinks
the black man slept in the same room two or three nights after
the marriage, but is not certain. Witness was hired to do house-
work. Was thirteen when she went there. No rate of wages
was agreed upon, but when she wanted any thing, the first Mrs.
F. was to give it to her.

SAMUEL S. CARMAN, for the defendants. Did not see testa-
tor till seven or eight months after he was taken ill, after which
saw him pretty frequently till his death, visiting him from once a
fortnight to twice or three times a week. Testator seemed to
have an impediment in his speech, and at first witness could un-
derstand him, but not perfectly. After two or three months

could understand him perfectly. He always conversed with witness at his visits, and always sensibly, as witness thought. Never until after his death, heard or suspected that testator was not of sound mind. Cross examined. When witness could not understand him distinctly, Mrs. H. or his wife would explain. They appeared to understand him always. He frequently asked witness what the news was in Brooklyn, and what people were doing. Knew him twelve years before his sickness. He was a smart man and of strong mind. Could not perceive that his sickness affected his mind in any degree. Never found any difference in testator's capacity of mind, but sometimes he conversed more than at other times. Never had the least suspicion that his mind was affected. When witness first went in on his visits, testator appeared to be affected in a singular emotion resembling a mixture of laughing and crying, which did not last more than a minute; the laughing first and the crying last. Shortly after his marriage, witness congratulated him upon it and shook hands with him, and he laughed and ordered a glass of wine for witness.

JOHN A. RUSS, for the defendants. Is a midshipman in the navy. Came to board with W. Cornell, his father-in-law, in the same house with Mr. F., on the 2d of May, 1826; was there till the middle of June, again there from September 5th, till November 1st, and after that lived near by and visited Cornell and saw testator frequently till April 13th, 1827. Saw him almost every day, while witness boarded with Cornell, and two or three times a week after that, and generally conversed with him. During all this time, it never occurred to witness that testator's mind was otherwise than perfectly sound, and never suspected it to be otherwise. His conversation was always as correct and rational as any man's, but his utterance was always indistinct and low, and at times he could only converse in a whisper. His answers and observations were always rational, and he always appeared to understand what witness said to him.

Cross-examined. Being asked on what subject F. conversed, witness says he does not recollect particulars, but he recollects when he was about to sail in the Lexington the middle of June, F. inquired where she was going; witness said to the West

Indies, to which he shook his head and said, "sickly there." He then made some observations in whispers against witness's going there. At another time, he opposed witness's quitting the navy, which he talked of doing. His conversation was about as much in whispers as aloud. Mrs. F. did not generally join in the conversation. Sometimes F. would attempt to make an observation aloud, and before he would get through, would appear oppressed and speak in broken sentences, and Mrs. F. would finish it for him and explain his meaning, and ask if it was so ; he would nod his head and say, *yes.*

Re-examined. F. occasionally requested witness to read the newspapers of the day to him, which witness did, and he appeared to understand and take an interest in it. Mrs. F. appeared to be very attentive to the testator.

ABIGAIL DE HART, for the defendants. Spent three weeks with Mrs. F., in June, 1827, and saw testator from twice to three times every day, and had much conversation with him. Believed his mind to be perfectly sound, and had not the least suspicion of any unsoundness of mind.

Cross-examined. He was in a very enfeebled state of body, and did not converse much. Conversed with him on various subjects. With him and Mrs. F., witness conversed on money affairs, and about her own concerns, and what she had better do with a small sum she had. Mrs. F. proposed to purchase lands ; testator said " No, stock was better " for witness. He manifested superior intelligence, and more than common understanding, much more than ordinary men. Never discovered the least imbecility of mind, or want of memory. At first could not understand him so well, but afterwards could perfectly. His conversations were not long; he would utter two or three sentences together so as to be understood by any person.

Re-examined. Testator's feelings towards the Clarke's were not very pleasant, as she infers from this. In January last, (1827,) Mrs. F. had received some money, and she said to her husband, you had better make a compliment of $1000 to each of the Mrs. Clarke's. He said *no ;* she again pressed it, and said they had large families. He said *no,* they did not care for him.

ANNE SMITH, for the defendants. Was intimate at testator's

house, and knew him over ten years; visited him occasionally during his illness, sometimes stayed all night, and always conversed with him when she went to see him. Always thought his mind sound, particularly on subjects of business. Heard him converse about property, and on the subject of stocks, of repairing his houses, and the like, and had no suspicion his mind was otherwise than sound.

Cross-examined. Is third or fourth cousin to Mrs. F. Testator when well, was a very sensible and polished man. He never manifested any imbecility or weakness of mind on any subject. He spoke intelligibly, and witness could always understand him, and has no doubt any person could. This was so from five or six weeks after his attack, till near his death.

MARGARET DUFFIELD, for the defendants. Visited the testator frequently after his second marriage. About a week after, was there, and Mrs. F. introduced her to Mr. F. as her husband. Went up to F. and wished him joy, and remarked to him, he looked a great deal better. He said he was a great deal better. Told him he appeared to have the use of his limbs, and particularly his hands. He said *yes*, and rubbed his hands together. Asked him whether he could use his feet, and he said *O yes*, and drew up his feet to show he could use them, and stretched them out again. He apologized for being unable to speak fluently, and showed his tongue, which had an ulcer upon it. He said he did not know if the ulcer was occasioned by the badness of his teeth, or the mercury he had taken, that during his sickness they had given him a great deal of mercury. At that time he appeared evidently better, and he afterwards grew better still, and witness saw him walking, leaning on Mrs. F.'s shoulder. Some time last winter, (1827,) witness was there, talking about some of her business with Mrs. F., in the testator's presence. Mrs. F. told witness, I would do so and so; he said, do not do it. Why? said Mrs. F. Because, said he, it is not law, you cannot do it, Mrs. Duffield. Some time after, witness was again there, and testator was sitting before the fire. Mrs. F. was talking about her marriage, and said Mr. F. had formerly made a will, which he had destroyed since her marriage. Witness said to him, Mr. F. in the situation you are, if I was you, I would regulate my

affairs so as to leave peace behind me. He said to witness, should I die without a will, Mrs. F. will have sufficient. Witness said to him, from what I learn, they intend to contest that too. To which he replied, shaking his finger, let them if they dare, and I will marry her over again. From all she saw of him and heard him say, she has not the least doubt but that his mind was perfectly sound, and she never doubted it. Not more than three months before his death, in conversations with her and Mrs. F., he corrected them as to day and date, as to transactions they were talking about, and then, as on other occasions, his memory appeared perfectly good.

Cross-examined. Was intimately acquainted with testator before his illness. He was considered a man of considerable talents, and genteel in his manners. His disease appeared to affect his body only; his mind and memory were unimpaired, and appeared as good as she had ever known them, and so continued until her last visit, about a week before his death. He appeared as competent to transact business of any kind, as when in full health. Was never present when he made any bargain. Witness is mother-in-law of Mr. Willoughby, one of the executors. Mr. W. was not intimate with testator, and he was surprised when he heard he was appointed an executor in the will.

JOHN SMALLEY, for the defendants. Saw testator at least fifty times after 1825. Conversed with him about the rise and fall of stocks. Could understand him, although he could not articulate plainly. Considered him able to understand business, and to judge correctly in all matters of common business. Never discovered any imbecility of mind in him. Had no doubt of his capacity to make a will. Applied to him, to execute a release to Mrs. G. Lawrence Fisher and her unborn child, of his right in Lawrence's property. He refused, but said he would never trouble her or her child. Mrs. Diana F. was present, but neither advised nor dissuaded F. in the matter.

Cross-examined. Testator's conversation was in some degree pantomimic, and was much more intelligible after a person had become accustomed to it, than at first. He could not utter distinctly a continuous sentence if it were long, but could utter it intelligibly to those accustomed to his conversation. He could.

utter a short sentence, as "It is fine weather," "I have been riding out," and the like. In a long sentence, witness could not · have understood him without observing the motion of his lips, his gestures, and the expression of his countenance. Thought G. L. Fisher was partially deranged in intellects before his marriage, and his derangement was generally very apparent. He was always so far deranged while witness knew him, as to be incapable of executing a will. Mrs. Diana F. was always on very friendly terms with Mrs. G. L. Fisher.

MARGARET ROSE, for the defendants. Lived in Mr. F.'s family four years, till her marriage just before his sickness, and saw him frequently till his death. On the 14th of July, 1824, rented a house and lot of him for ten years, at the rent of $80. The lease was to her husband. She made the bargain for the lease with F. personally. Went to see him several times about it, and tried hard to get it for fifteen years at $70 rent. The rent of $80, was the full value and a little more. Saw the testator sign the lease; (which was produced to the witness.) Mrs. Hawksworth wrote the body of it. Neither she or Diana gave any advice to F., or interfered in the transaction. Was present at Mr. F.'s marriage with Diana. He stood up a little while at the commencement of the ceremony; before it was over, he said he was tired, and asked the minister if it would be proper for him to sit down, and on being told it would, he sat down. Witness never heard F. say, nor saw him do, any thing that induced her to suspect his mind was not sound. Always thought he was in sound and perfect mind. He could not speak very plain, but she could make out to understand what he said, and he understood what she said to him.

Cross-examined. Very seldom conversed with testator, except about the lease, and he very seldom said any thing to her. Never saw him alone during his illness. Saw no difference in his mind after his sickness, and he was fully as capable of transacting business as before, and so continued until his death. She considered the marriage of the testator at the time, as a reasonable and rational act.

ALEXANDER BIRKBECK, for the defendants. In June and July, 1824, took leases from the testator for two lots of ground

in Brooklyn. Applied to him first for one lot. He inquired what witness wanted of it. Witness told him, to build an iron foundry on, and he wanted a lease for twenty-one years. F. objected to give a lease for so long a time. His speech was difficult for witness to understand, and Mrs. Hawksworth, who was present, often interpreted what he said; she appearing to understand him better than witness, who then addressed himself to her, she repeated to testator and received his answer, and repeated it to witness. In this manner the bargain between him and witness was concluded. He refused to give a lease for more than twelve years, or to pay for improvements put on the premises. He asked $50 for the rent, which was a fair rent, and witness agreed to give it. Mrs. H. took no part, except to repeat what was said. A lease was afterwards executed. Testator himself signed it. In June, 1824, witness applied to him for another lot, adjoining the former, and obtained a lease, which was signed by the testator, though witness did not see him sign it. Has paid the rent five or six times, first to Mrs. H. in testator's presence, and latterly to Mrs. Fisher, when he was not present. Each signed the receipts with her own name, for the testator. In the negotiation he appeared as competent to make a bargain, and to understand it as well as witness himself, and witness thought he was competent to do business, and his mind was sound.

GEORGE SCOTT, for the defendants. Was married May 2, 1827, at testator's house, and slept there that night. Next morning first saw him. Was introduced as the person who had married Miss Denyse, upon which he wished witness a great deal of joy. His speech was broken, but witness understood him plain enough.

RIME SCOTT, for the defendants. Was married to the last witness as before stated. She knew F. eight years, and was frequently at his house. The day before her marriage she told him it was intended, and asked if she might stay there two or three days. He said yes, and he hoped she might do well. In the evening, when dressed to be married, she went into his room ; he called her towards his bed and told her she looked very nice. Next day he wished her a great deal of joy. Cross examined.

Never had any suspicion that the testator's mind was unsound, nor heard any one say it was.

CATHARINE BOWLES, for the defendants. With her sister Ann sold lands to the testator at three different times. The first sale was about September, 1824, the next the year after, and the third the year after. Cannot specify the times precisely. The bargain for these lands was made by witness and her sister with the testator; no person for him, taking part in the conversations. The first sale there was but little conversation; he wanted a less price, but soon acceded to what they asked. The next year, he would not accede to their price, and they talked about it several different days, but finally he gave their price, and asked the refusal of their remaining lands in the same vicinity. On the third occasion, they called to see him, about the end of last winter, (1827.) Soon after they came in, he asked if they had sold their remaining lands, and said he would buy them if they had not. There was some conversation as to the price, and soon after but not on that day, a bargain for those lands was concluded. On all these occasions, the testator appeared to understand himself perfectly, and to be entirely competent to the making of the bargain. He gave them no more than the fair value of the lands. Cross examined. The lands were in Rapelye's patent in Delaware county. Testator said he had been through that county, but had not seen these lands. Would take her word as to the quality of the lots, and the information which she stated she had from persons near them. He said he did not get much interest for his money, and he might as well have the lands, and he intended to keep them. He also said he had no land in that patent, and would like the lot because his wife's father's name was mentioned in the patent. Mrs. F. was present, but said very little. They gave him the refusal of the third lot, when he bought the second. There were four or five hundred acres in the whole. Cannot now tell the price she got, nor within $300, or $400, of the price. Was offered two dollars an acre for them several years before, by a person who lived on the lands. Did not then wish to sell. Mr. J. Dean was present each time when the deeds were executed. One lot belonged to witness, one to

her sister, and one to them both.   She refers to the sale of all three.

ANN BOWLES, for the defendants.   Knew testator by sight, eight or ten years prior to December, 1824, and after that visited him occasionally till May, 1827.   Thinks the sales mentioned by her sister, were the first in December, 1824, one the next summer, and the last in the summer of 1826.   (In other respects, her direct testimony was in substance like her sister's.)

Cross examined.   The price of the first lot sold was $1 50 per acre.   Testator inquired if all taxes and quit rents had been paid up.   Was informed they had been, and the receipts were produced.   Witness and her sister did not go with a view of selling these lands, and did not think of selling them.   He had the map and field book of the lands to look at, and inquired as to the quality.   It was a map rolled, not folded, and was taken to his house at his request, after the first and before the second purchase. The second sale was talked about at three interviews.   Thinks they took a less price on that, than they at first asked.   It was more than they took for the first lot.   The third lot was sold for a higher price than the second ; thinks it was $2½ or $3, per acre.   Visited him last in May, 1827.   He had an impediment in his speech, but she could understand distinctly each word he spoke.   Did not hear him prompted, or hear any one assist to explain his meaning.   He did not speak as distinctly at some times, as he did at others.   Mrs. F. in no instance took any part in the bargains for the lands.

FREDERICK C. SHAEFFER, for the defendants.   Is pastor of the Lutheran church of St. James, in the city of New York. Knew G. Lawrence Fisher seven or eight years.   He was of sound mind when witness first knew him; afterwards became insane, and was sent to the Bloomingdale Asylum.   Previous to October, 1824, saw him out of the Asylum, and believes his sound mind was restored.   He had been discharged cured, about six months before.   He called on witness in October, 1824, to go over to Brooklyn and marry his brother John Fisher.   Lawrence F.'s mind was then sound, as witness judged after talking with him.   On the ensuing Sunday, witness went with him to testator's house, where witness was introduced to testator and to Di-

ana Rapelye. It was late in the afternoon. G. L. Fisher and Miss R. stated that testator was infirm, had been sitting up long, and was fatigued, and requested that he might be permitted to sit during the ceremony, to which witness assented. Being told this and perceiving he was infirm, witness conversed with him, before proceeding with the ceremony, with a view to ascertain whether the state of his mind was such as to satisfy witness he was doing his duty as a christian minister in marrying him ; and the result was a conviction that the testator was of sound mind. Does not remember the particulars of the conversation, which was short. Witness then married them in the presence of G. L. Fisher, Mr. and Mrs. Rose, and some others. Never saw the testator, except at that time. The Fisher's were Germans by birth, and Lawrence conversed with witness in German. For many years, witness preached in the German language.

Cross examined. Did not see the testator rise or stand while he was in the room. He appeared to unite in the request that he might sit during the marriage ceremony. Is confident this request was before the ceremony. The answer of witness was addressed to testator. After the ceremony, wine was handed round, and a glass of wine was handed to the testator which he drank ; his hand trembled, and his wife assisted him in holding it. On wishing him all joy and happiness, he thanked witness with an appearance of emotion ; and when witness promised to call again, he appeared much gratified.

MARIA KNIGHT, for the defendants. Knew F. from 1821, till his death. Was a visitor at his house at his first wife's request, for about a year, till just after her death ; and afterwards was at the house frequently, and conversed with him. Lived there while Lowther was there. Could always understand testator when he spoke, and during all the time, never suspected he was of unsound mind, nor heard any one say that he was. On seeing him after she got married, he said to her, " So Maria, you are married ;" and asked whom she had married, and what was his trade, and on being informed, said he was happy she had done so well. This was the last time she ever saw him. She was married in August, 1825. Lowther was a very steady man. Never heard any thing against his character. He was some-

Clarke v. Sawyer.

times away, when he ought to have been there. After the first Mrs. F.'s death, witness purchased mourning for the family by F.'s direction, who told her to go to Vanderveer's and get what was wanted. Mrs. Hawksworth was present and no one else.

Cross examined. He directed her to buy bombazine for mourning for herself, Miss Denyse, Miss Ryder, Lowther's wife, Diana R. and Mrs. H. Witness also bought scarfs, muslin, gloves &c., for the funeral. He desired to see the articles, and she showed them to him. He said they were none too good for his wife, and if he could do more for her he would. Did not perceive that his faculties were impaired by his sickness; he trembled and shook. Never perceived during all his sickness, but that he could converse as freely and as rationally on all subjects as he could before. He pronounced so that witness and all could understand him. Never heard Mrs. F. repeat or attempt to explain to any one what he said. He was as capable of transacting business, in respect of his mind, as he was previous. Judges from his conversing with her on a variety of family affairs. He complained of a soreness of mouth, which injured his speech. From what she saw, his mind was not in the least degree impaired.

WILLIAM H. ELTING, for the complainants. Rapelye's patent is in the lower part of Delaware county. Does not know as to the quality of lands in it. Lived many years in that county, and has been in the south part of it, which is generally rough and very mountainous. Would not give over fifty cents an acre for mountain lots which do not come down to the Delaware river. At a sheriff's sale, under instructions to bid two thirds of the value, witness bid off lands in that part of the county, for from fifty cents to a dollar and fifty cents per acre, and some as high as two dollars, he believes. The latter were nearer the river and had some timber.

E. H. Owen, and W. Silliman, for the complainants, submitted the following points.

I. The testator was wholly incompetent to make a valid will after his apoplectic fit, which terminated in paralysis, in the year 1824. (Clarke v. Fisher, 1 Paige, 171.)

II. Being so incompetent at that time, and his affliction con-

tinuing down to the time of his death, it is incumbent on the defendants, to show affirmatively his competency to make a valid will at the time of its execution. ( *White* v. *Wilson*, 13 Vesey, 87 ; *Peaslee* v. *Rollins*, 3 Metc. 164 ; Best on Presumptive Evidence, 186.)

III. This the defendants have failed to do ; but on the contrary, the weight of testimony clearly shows his utter incompetency to make a valid disposition of his estate at that time.

IV. The testator was induced to make and publish the will in question, by fraud and undue influence imposed upon and exercised over him, during his last sickness, by his widow and others who were about him ; and the same therefore, not being his will, is void. (1 Paige, 176 ; 1 Story's Eq. Jur. §. 234 ; *Whelan* v. *Whelan*, 3 Cowen, 537 ; *Blatchford* v. *Christie*, 1 Knapp, 73.)

V. The will in question, is void for uncertainty and repugnancy in its parts.

VI. But should it be adjudged valid, then by its true construction and interpretation, the devise in fee to the widow is void, being revoked by the subsequent valid devise in fee simple of the same estate to Magdalen Cornelia Fisher, and the heirs of Maria Clarke, Eleanor Clarke, Ann Smyth and Isaac Rapelye. (2 Paige, 122 ; 12 Wend. 602 ; 5 Ves. 247 ; 2 Plowd. 541 ; Lovelass on Wills, 293.)

VII. Such subsequent devise to Magdalen and the heirs of the persons above named, is executory, and will not take effect until the death of the widow, so that, the devise to the widow being void, the rents and profits during the life time of the widow remain undisposed of by the will, and therefore descend to Maria and Eleanor, as the only heirs at law of the testator, subject to the widow's right of dower, or thirds, therein.

VIII. But if the devise to the widow was not absolutely revoked, by such subsequent devise, still, it did not give her an estate in fee, but only a life estate determinable at her death ; and the other devisees, Magdalen excepted, took a contingent remainder in fee in the same estate—so that if the said widow should die before such devisees, such contingent remainder, by reason of there being no person in *esse*, in whom it could vest, upon the termination of the particular estate, would fail, and the estate

would thereupon descend to Maria and Eleanor, as his heirs at law.

Mr. *Silliman* cited in addition, on the necessity of instructions, &c., *Billinghurst* v. *Vickars*, 1 Phillimore, 187; *Evans* v. *Knight*, 1 Addams, 229; *Brogden* v. *Brown*, 2 ibid. 441; *Bridges* v. *King*, 1 Hagg. Consist. R. 256; *Marsh* v. *Tyrrell*, 2 ibid. 84; *Ingram* v. *Wyatt*, 1 ibid. 384, and 3 ibid. 466; *Mc-Kenzie* v. *Handyside*, 2 ibid. 211.)

*D. S. Jones*, for the defendants, Sawyer and others, made the following points:

I. John Fisher, the testator, was of competent mind to make a will, at the time of making the will in question in this cause. The chancellor's decision as to the personal estate has no controlling influence here. (*Denton* v. *Jackson*, 2 J. C. R. 320; S. C. mentioned in the digest, 7 J. C. R. 254; *North Hempstead* v. *Hempstead*, Hopk. R. 288; and affirmed in 2 Wend. 109; *Bogardus* v. *Clarke*, 1 Edw. Ch. R. 266.)

II. The will was not procured by fraud, imposition, or undue influence; but was the voluntary and unbiassed act of the testator.

III. 1. By virtue of this will, Diana Fisher, the widow of the testator, now Diana Sawyer, the wife of the defendant Lemuel Sawyer, became entitled to all the estate of which the testator died seised or possessed, in fee and absolutely. *Or*, 2. She became entitled to the house and lot on the corner of Front and Dock streets, in the village of Brooklyn, mentioned in the said will, in fee; to one-half of the residue of the estate of which the said testator died seised or possessed, in fee and absolutely; and to an estate for her natural life, in the other half of the said residue of the said estate. *Or*, 3. She became entitled to one-half of the estate of which the testator died seised or possessed, in fee and absolutely, and to an estate for her natural life in the other half of the said estate. *Or*, 4. She became entitled to an estate for her natural life in the estate of which the testator died seised or possessed. (1 Jarman on Wills, 411, 417.)

That Lemuel Sawyer, by virtue of his marriage with the said Diana, became entitled to an estate in all the estate to which the

said Diana became entitled as above mentioned, to hold the same during the natural life of the said Diana, with remainder after his death to the said Diana and her heirs.

*W. Curtis Noyes*, for Magdalena Cornelia Fisher.

THE ASSISTANT VICE-CHANCELLOR—When the will of John Fisher was before the chancellor, he decided that as a will of personal property, it was invalid, and reversed the order of the surrogate admitting it to probate. His decision was upon the ground of the imbecility of the decede nt'smind , and the undue influence to which he was subjected ; at the same time avowing his opinion that either ground was sufficient to invalidate the will. (*Clarke* v. *Fisher*, 1 Paige, 171.) The question is now presented upon its validity as a will of real estate, and it is well settled, (although it is to be hoped that as the reason for the anomaly has essentially ceased, the rule itself will be changed ;) that the chancellor's decree is not decisive or even controlling upon the point now raised. The case of *Bogardus* v. *Clarke*, (1 Edw. Ch. R. 266,) exhibits the rule and its reason, in reference to this identical will.

Being thus deprived of the relief which the decision of my learned superior should have afforded, I was induced on my first consideration of the case, to direct an issue. But I found that there were serious difficulties, the fault of the great delay of the parties on both sides unquestionably, but nevertheless such as I am not at liberty to disregard. More than eighteen years have elapsed since the testimony was taken. Some of the witnesses I know, and I presume many others, are dead. The events are of nineteen or twenty years standing. Few of the benefits of an oral and personal examination of the witnesses could be obtained upon the trial of an issue under such circumstances; and probably neither party would regard it otherwise than as an in-fliction of unnecessary trouble, expense and delay. I therefore feel it to be my duty, to dispose of the case upon the evidence before me; and I have seldom encountered a duty that in all its aspects, has been so unpleasant.

Before proceeding to the main question, I will premise, that

the complainants have not brought the necessary parties before the court to have a construction of the will, in case it shall be held valid. And in my remarks upon its character, I shall not go beyond the probable intent of the decedent apparent upon its face; leaving out of view the inquiry whether the will legally effectuates such intent.

*First.* In regard to the decedent's capacity to make a will.

This inquiry led to a minute investigation of his health, and the history of his life from the first of May, 1823, until his death on the 29th of June, 1827.

Prior to May, 1823, the decedent had enjoyed good health and all the testimony concurs in representing him to have been a man of unusually strong and vigorous intellect, and of uncommon argumentative powers. He was at that time living with his first wife, but was childless, his only son having died before attaining to manhood, many years before. His blood relations were a brother, George L. Fisher, then unmarried, and two nieces, the daughters of another brother who had been dead ever since 1787. Both of these nieces had been married a long time, and had families of children. One of them resided in Brooklyn, and the other in Western New York. There does not appear to have been any intimacy or correspondence between the decedent and the latter family, nor much intimacy with the family of the other niece, who resided in Brooklyn. He was not in the habit of visiting there often, but this niece, Mrs. J. B. Clarke, visited his house, and in the early part of his sickness, was a constant visitor there. The decedent's wife had sisters and a brother living in the vicinity, but no intimacy between them and the decedent is shown.

At the period of his illness, he was sixty-six or sixty-seven years of age.

I will mention some of the dates which become important in the inquiry. The attack of apoplexy was on the 3d day of May, 1823. His first wife, Cornelia Rapelye, died on the 4th of March, 1824. The decedent married Diana Rapelye, the sister of his first wife, on the 31st of October, 1824. The will in question, was made on the 2d of May, 1827, and he died on the 29th of June following.

The bill alleges that the stroke of apoplexy deprived the decedent of his speech and the use of his limbs; almost destroyed his mental faculties, and rendered him totally incapable of thought. That the apoplexy gradually terminated in palsy under which he permanently continued, and by which he remained deranged in mind, and entirely incapable of transacting any business whatever. For one or two weeks succeeding his wife's death, his mental faculties appeared to be partially roused, so that he appeared to comprehend in some measure conversation which was addressed to him, and to answer it partly by signs, and partly by speech, but he continued entirely palsied and helpless in limbs and body. And except during that fortnight, the bill charges that there was no time between May 3, 1823, and his death, when the decedent was capable of comprehending and assenting to a will; and the complainants are not satisfactorily convinced of his capacity during the excepted period.

The bill was verified by the oath of James B. Clarke, who, if intestacy were established, was tenant by the curtesy of one-half of the real estate.

The answer of Diana Fisher, which is responsive to the bill, admits that the apoplexy terminated in palsy, and that the decedent continued enfeebled in his limbs and body till his death. She denies that he continued wholly helpless or unable to rise; or that he was imbecile, enfeebled or unsound in mind, after his partial recovery from his first attack; and she avers that the state of his mental faculties improved after the spring of 1824, and were stronger and more sound the last year of his life, than they were the fortnight succeeding his first wife's death.

There are some facts respecting the decedent's situation, which are so clearly established, that I need not refer to the particular testimony by which they are proved; and will proceed briefly to state them.

His attack of apoplexy was very severe. It paralyzed him and deprived him of his senses. Apoplexy always affects the brain, and one physician says his was particularly affected. The decedent however had so far recovered, that before Dr. Ball ceased his attendance, which was the latter part of July, 1823, he un-

Clarke v. Sawyer.

derstood the doctor's questions, and his speech had become so far intelligible, that the doctor could understand some of his words. The palsy in which it terminated, was not decided *hemiplegia.* The hands and feet were affected, and one side somewhat more than the other.

In the early period of his illness he could not feed himself, but he could the last two or three years, and could use his hands, and draw up his feet. He spent most of his time in bed, but during those three years, he could and did set up for hours at a time, and could sit without assistance or support. He was also in the habit of riding out occasionally, and once in 1825 or 1826, (as it casually came out in the testimony,) he rode to Bloomingdale in New York, some six or seven miles, and remained there to dinner. He was helped into and out of the carriage on these occasions.

During the whole time, his articulation was considerably impaired, but those in the habit of conversing with him, readily understood what he said. At various periods, it was shown that he had a sore mouth or ulcerated tongue, which was probably in part the cause of his defective utterance.

To those who saw him but once, or unfrequently, his speech was understood with difficulty ; and to some of those persons, he had the appearance of crying without cause, and of laughing and crying together.

No person was appointed to manage his affairs, but he was left to direct the transaction of his business, to the close of his life. And during his life, no distinct allegation appears to have been made by any of his relatives or friends, that he was imbecile or unsound in mind.

A great part of the testimony adverse to the will, relates mainly, and much of it exclusively, to the attack of apoplexy, and the time immediately succeeding it. Such of it as is clearly brought to bear upon the time subsequent to Mrs. Cornelia Fisher's death, will be noticed more at large.

There is no *lunacy,* or habitual insanity, imputed in this case ; and I do not understand that it is to be treated as a case of general derangement of mind, because it is shown that for two or three months, or even four or five months, the decedent was

laboring under and recovering from an attack of apoplexy, and was suffering its necessary and usual concomitants, a deprivation of reason in the outset, and its gradual restoration.   On the contrary, the recovery from its effects, so far as to survive four years and upwards, presumptively shows that the patient must have overcome its most violent and peculiar features.   It is true, the mind is often left imbecile; but that is in cases of a lingering continuance of the disease; and I find no such instance stated by medical writers, where the patient survived four years without any intervening attack.   The fact that palsy ensued, does not affect the point; for palsy is not shown to impair the mind, any more than the ordinary diseases which reduce the bodily strength.

I may err in my view of the subject, but I think that the delirium or imbecility of mind, or unconsciousness, which ensues from violent or acute diseases, is not to be regarded as establishing a general derangement of intellect, so as to throw the burthen of proving a sound mind, upon the party setting up a deed or will executed long after the force of the disease is spent, or it has terminated in one of a different character.   Without stating the cases at large, I refer to *Attorney General* v. *Parnther*, (3 Bro. C. C. 441;)  *White* v. *Wilson*, (13 Ves. 88, 89;) *Waters* v. *Howlett*, (3 Haggard, 790;)  *Chambers* v. *The Queen's Proctor*, (2 Curteis, 415.)   And see *In the goods of Field*, (3 Curteis, 752,) where the will of a paralytic, made when incapable of speech or of signing his name, was pronounced for, however it was not contested.

In this case, if the complainants are driven to prove mental imbecility in May, 1827, without the aid of the presumption of general derangement of mind continuing from 1823; they must fail beyond a doubt.   With the weight of the answer, and of all the positive testimony of the decedent's acts in 1825, 1826, and 1827; there is no sufficient testimony on the other side, within those years, that is at all adequate to compete.

Assuming however, that it is incumbent on the defendants to show the decedent's restoration to the use of his mental faculties; how stands the case?

Much of the testimony, as is usual in these cases, consists of

opinions of witnesses.   The  opinions  of  physicians  are  proper
evidence.   The opinions of others, are to be weighed by the facts
on which they are based ; and the facts are  therefore  more im-
portant than the opinions.    (See *Evans* v. *Knight*, 1  Addams,
229, per Sir John Nicholl.)    As to the physicians, Dr. Ball, who
attended him in his first attack, for several weeks, thinks he pre-
scribed for him once in February, 1824 ; but he did not visit him
at all after March, 1824.   He perceived  no change for the better
after July, 1823 ; yet the bill founds an important  allegation on
a change early in March, 1824, and every witness who saw him
frequently, speaks of a decided  and  marked  improvement after
the summer of 1823.

Dr. Wendell visited him as a physician during the first month
of his apoplexy, and saw him again but without conversing with
him, during Mrs. Cornelia Fisher's last illness in February, 1824.
His opportunity of judging, after the  first attack, was too limited
to enable him to  give a reliable opinion.   His testimony  as to
apoplexy, goes far to do away with the idea of a general derange-
ment of intellect, being applicable to this case.

Dr. Rowland's testimony is  more  important, for  it relates to
April, 1827, just before this will  was executed.   He thought
the decedent's mind was very weak, and that he was not capable
of making a contract.   Dr. R. did not converse with him, or hear
him say any thing from  which this  opinion was formed.   But
it was from his laughing and crying, the appearance of his coun-
tenance, and his doing  nothing except through his wife, and as-
senting to all she proposed and  said.   Yet this  witness  did  not
hesitate to enter into a  written  contract with  the decedent, and
one which it is evident would not have been made by either  the
witness, or by Diana Fisher, without the decedent's presence
and sanction.   The act in this instance, speaks louder  than  the
opinion.

On the other hand, Dr. Cameron, who attended  the decedent
occasionally, and was his only physician, after the spring of 1824,
did not perceive that his mind was diseased, and has no doubt
that he was of sound mind.   Dr. C.'s last visit was in  April,
1827.   His opinion is strongly corroborated by that of Dr. Watts,
who saw the decedent once only, in  July or August, 1826,

Though Dr. W. had never conversed with him, he had no difficulty in understanding what he said. The conversation which he details, can scarcely be reconciled with mental imbecility. Few wills made during sickness, can ever have the support of as strong proof of sound and disposing mind and memory, as is afforded by this interview with Dr. Watts.

Upon the testimony of the experts therefore, the proof of capacity is strong. The two attending physicians in 1823, are restricted to the first attack. Dr. Rowland is much shaken by his own act, and the testimony of Drs. Watts and Cameron, prove abundant capacity in 1826, and the latter its continuance to the era of the will. In a case much weaker than this, upon the medical testimony, Sir John Nicholl disregarded the opinion of both the attending physicians. (*Evans* v. *Knight*, 1 Addams, 229.)

The other witnesses against the will, who did not see the decedent after Mrs. C. Fisher's death, I need not advert to in detail, in the view I am now taking, in which I am throwing the burthen on the defendants.

Two circumstances, which they in common with others, dwell upon, I will mention. The laughing and crying, or appearance of so doing, was in part natural, and is thus accounted for. The decedent was easily amused, and would laugh at a joke or interesting remark. And it was equally natural that he should shed tears, when meeting or parting with an old companion, associate, or friend ; for he could not help being deeply moved by his situation, and its contrast with his former active and energetic life. The laughing and crying in the same breath, was doubtless, the nervous affection of the muscles of the face, or *hysteria*, which is described by the physicians. That this is the explanation, is proved by the fact that those who saw the decedent daily or frequently, and were accustomed to the appearance of his face, discovered nothing of this simultaneous crying and laughing. The childishness, which is mentioned by some of the witnesses, is founded mainly upon this appearance of the face ; and not upon what he said or did.

The other circumstance, the difficulty in conversation, was in part ideal, as proved by Dr. Watts and numerous other witnesses ; and in part was owing to the defective power of articulation, from

causes before mentioned. This defect to one seldom seeing him, would appear to arise from want of mind, while it may have had nothing to do with his mental capacity.

Of the witnesses against the will, after the death of Mrs. C. Fisher, Mr. Sands saw him once just after her death; again in the fall of 1824, or winter of 1825; and for the last time, in the summer or fall of 1826, for about five minutes. He says he thought *the force* of the testator's mind was gone. This might well be, and leave enough mind to make a will. The witness says the testator could understand *little things,* as the incorporation or location of a bank, and matters generally which affected his interest. And he proves that the decedent did understand, when the witness called to surrender the lease for a tenant. But some new phase in politics, the decedent could not appreciate, (in 1823, 4;) and the witness thought he could not form just conclusions in any thing complicated.

Now there are three facts in this testimony, which with what I have already stated, go far to sustain the decedent's capacity by this witness. In the spring of 1824, the witness was present and aiding in the execution of the decedent's will. In the fall or winter ensuing, he called on the decedent to negotiate and effect the surrender of a lease; and in the summer of 1826, he as the keeper of that will, at the request of the decedent, restored it to him, obviously to be cancelled. (See Sir Herbert Jenner Fust's remarks on similar acts, in *Wrench v. Murray,* 3 Curteis, 623.)

Mr. Spooner, another intelligent witness, was decidedly of the opinion that the decedent had not sufficient mind to transact business. He states the fact that Mrs. Fisher did the talking, and received payments made by him, and he could not understand what the decedent attempted to say. His last interview was in February, or March, 1827, and though Mr. Spooner, and Mr. Wright who was present and who never saw decedent after his first attack, except on that occasion, could not understand his words; both could perceive that he gave the direction to the donation; and his giving it to the poor of Brooklyn, instead of the Greeks, did not argue any absence of sound judgment. Mr. Spooner also was not unwilling to pay his bond and mortgage in decedent's

presence; though it may be he imagined that the wife of an imbecile had authority to transact all his business.

Thomas Lawrence, (whose deposition I think is admissible, as taken down by the surrogate, although not signed,) did not see much of the decedent, after his first wife's death. He founds his opinion on the decedent's appearance, and his inability to converse. Yet this witness thought he ought to make a will.

John F. Lawrence, saw the testator only two or three times, after he recovered from the severity of the first attack. The last occasion was in December, 1824, and then in the face of his declared opinion as to his competency, he received the decedent's check for more than $100.

Mr. Nichols, who was over seventy-eight years of age, visited the decedent five or six times, during the four years. He had no business with him, and did not converse with him, because the witness thought it useless. He inferred unsoundness of mind, from the decedent's holding on to his hand a long time, when he came in, and laughing and crying in the same breath. Mr. Nichols had been very intimate with him in former years.

The opinion of Elizabeth Denyse, who did not see him after 1825, and who speaks to no tangible fact in regard to his capacity, is too extravagant to require any notice.

Mr. F. Hopkins, saw the decedent only about five times, and except once, was with him not more than a minute at a time. This did not enable him to form any opinion, and he relates no material fact.

H. W. Cady saw the decedent but once, in December, 1826; and then thought he was not in his right mind, because the witness could not understand what he said.

Mrs. Park formed no opinion as to his mind, but was at the decedent's house the day the will was made, and Mrs. Fisher said he was too low for any one to speak to him. This was not inconsistent with sufficient capacity. The decedent had been unusually tasked on that day, both in mind and body, and it was quite of course that he should be depressed, after the excitement of the occasion was at an end.

Of Messrs. Titus, Stillwell, and S. James, it is sufficient to

say, that their opportunities were not such as to enable them to aid the judgment of the court.

Some other witnesses who were much relied upon, do not come within the period after Mrs. C. Fisher's death. Thus Bishop H. U. Onderdonk, (who says that his recollection as to dates and times is very imperfect,) I am satisfied, did not see the decedent after March, 1824, except on his New Year's call on the 1st of January, 1825.

Gen. Bogardus saw the decedent while laboring under his apoplectic attack, and the conversations he relates, were in the summer of 1823. I think he did not see the decedent after the fall of that year. Mr. Bogardus did not scruple, even in that, the worst stage of his disease, to obtain the decedent's checks for $250 and $500.

Mr. Vandenhoef visited the decedent with Dr. Ball, and this fact carries his testimony back to the winter of 1824.

Mr. Tredwell never visited the decedent after the death of Mrs. C. Fisher, and it is doubtful if he saw him after the fall of 1823.

One witness remains, upon whose testimony great reliance was placed; the male nurse, Lowther. He was with the decedent from the last of May, 1823, till the first of May, 1824; and saw him twice or three times subsequently, the last occasion being in November, 1824. His testimony is not very marked as to the decedent's mental capacity, and it is more pointed upon the question of undue influence. But I may as well state here my impressions of it, upon a careful and repeated perusal. He obviously testifies with a feeling or prejudice against the defendant; the cause of which appears in his being dismissed from service. The dismissal was clearly unexpected, at the time it occurred, for he had just brought his wife there, and they were occupying the front basement. This feeling of ill will, has led him to testify quite loosely. Thus, he says he did not see the testator grow better or worse, during the eleven months he remained there, nor did he perceive any difference in his speech; and his mind was no better after his first wife's death, than it had been in the previous part of his illness. Now contrast this with the proof on all hands, that when this witness first took

charge of the decedent, he was in the first stage of recovery from a violent apoplexy, helpless and incapable of speech, and his mental faculties just emerging from a total eclipse ; and the equally conclusive proof from the complainant's own witnesses, that before Lowther left, the decedent could converse intelligibly with those accustomed to him, was able to sit up and ride out, and was consulted in respect of his business affairs ; contrast it with Lowther's own statement of what the decedent said and did ; and it goes far to destroy confidence in his testimony. The deposition, though unfortunately, not taken down by question and answer, shows how the witness was led, by the examining counsel. His first assertion as to the decedent's capacity, was that " testator's mind was pretty weak." His specification in support of this is, that the decedent could understand the witness, but could not understand all subjects, or if he did, he did not let it be known. The latter was certainly probable, for it is not to be supposed that a man of the decedent's intelligence and standing, would be very familiar on abstruse or general topics with his nurse, unless he had really become childish ; or that he would converse with Robert Lowther as he would with Dr. Watts or Judge Furman.

To pursue the witness's course of testifying, his next point is, that the decedent was childish, and would cry and laugh almost in one breath, when people came in. I have said all that is necessary, upon this crying and laughing. The childishness is to be determined by his sayings and doings. Next, the witness says the testator did not transact any business. This was a sweeping statement, and he is made to qualify it forthwith ; and finally, his deposition shows no instance of a purchase being made of any kind, without the decedent's being consulted, except the single occasion of the goods procured for mourning, on Mrs. Fisher's death, and he found fault with that, and was angry about it. He testifies that when Mrs. Hawksworth asked him how he thought it would do for the testator to marry Diana, he replied it would not do at all, it was against the gospel for a man to marry his wife's sister. No ground of mental incapacity, or even of personal impotence, then occurred to him. After a considerable interval, he was brought to this point again, and he

says " in his opinion testator was not in a fit situation to be married, no more than a dead man, for he could not move himself in bed without help." He adds, that he saw no other reason, than that he was so helpless. This answer negatived mental imbecility, and the witness was pressed again, and then he says to the best of his opinion, testator's mind was as unfit as his body. To recur to the prior answer, as to the decedent's inability to move in bed, (and this was after Mrs. C. Fisher's death,) the witness had only a short time before, in exhibiting the indecency of Mrs. Hawksworth and the first Mrs. Fisher, represented the testator as repeatedly *kicking off* his bed clothes, and persisting in so doing, *in the summer of* 1823, while suffering under his first attack. The witness however corrected himself, so far as to say that the decedent could use only one leg at a time. The witness stated that Mrs. Hawksworth *and Miss Rapelye,* (the defendant, Diana,) lived with the testator while he was there, and controlled and managed his affairs. By and by, he testified that Diana did not come there till the fall or winter before her sister's death, and he made out that while she lived, the first Mrs. Fisher managed, and after her death, Mrs. Hawksworth.

So in regard to his own dismissal, he saw a plot of which he was the victim. He says he saw that Mrs. H. and Diana, were working a plan that he " should not be there to hear their conversations *or actions.*" Yet when the facts are drawn out about his leaving, it seems that the decedent complained of his not getting up earlier in the morning, Diana said he got too much wages, as to which the decedent said nothing, and *Mrs. H. made no complaint at all, but thought the witness ought to stay.*

Surely, a witness who thus exhibits himself upon the stand, is not entitled to much weight, in deciding grave and important questions of property.

I have now gone through with the testimony against the will, at the same time presenting in connection, all the testimony of the physicians on both sides. I am now considering the case, on the footing that a general derangement of intellect in 1823, has been shown, and that it is incumbent on those sustaining the will, to show the restoration of sufficient testamentary capacity.

In this view, the testimony for the complainants, is certainly corroboratory of the continuing mental imbecility, to a great extent·

1 will next look at the other side of the case, omitting as in the foregoing, all special reference to the time antecedent to the first Mrs. Fisher's death.

First in order, is the answer of Diana Fisher, entitled to the weight of two witnesses, speaking directly to the point.· Next is the testimony of Dr. Watts and Dr. Cameron, which I have sufficiently stated.

After these, a great number of witnesses testify to various conversations, and acts of the decedent, showing mental capacity. Sarah Ann Ryder, lived in his family four years, down to November, 1824, and saw him occasionally till the summer of 1826. While an inmate of his house, she saw him daily. Her opinion, like that of Lowther's, is of itself unimportant, but she testifies to several facts, which indicate sufficient mental capacity in the decedent. And she proves also, the real cause of Lowther's dismission, viz. frequent and long absences, and a disobliging angry temper.

I ought perhaps in justice to myself, to go through with a minute examination of this testimony, but it would swell beyond endurance, a judgment which is likely to be tedious at best.

Of these witnesses, there are several who were in the habit of seeing the decedent daily, and at various hours of the day, during considerable periods of the last two or three years of his life ; two at least, who resided under the same roof, for more than a year next preceding his death ; two others who resided in the house for several months, in the year 1826 ; and one who was there for two or three weeks after this will was made. These witnesses, with the best opportunities of knowing and observing any act disclosing mental imbecility, all concur in proving him to have been of sound mind.

And I may here remark, that if this decedent after February, 1824, were really such a mere intellectual wreck, as he was represented by the complainant's counsel, it is very surprising that during the three years preceding his death, not a single act or expression of his has been brought forward, which sustains the charge. On the contrary, there are many acts proved, which

are to my mind, utterly at war with the position that he was, or that his relatives deemed him to be, of unsound mind.

I have alluded to their omission to interfere by obtaining the appointment of a committee of his large estate. It does not meet this point, to say that no disposition which he could make, would be valid, because he was *non compos mentis.* He had a large personal estate, and valuable stocks. What was to prevent him, or the persons about him, from wasting and making away with the whole of them ? If reference be made to the will of March, 1824 ; that was given up by Mr. Sands to be cancelled in 1826, and from his position with these parties, when the will was made, I cannot doubt but that the decedent's relatives were at once apprised of its being cancelled.

But the acts of Mr. James B. Clarke, which are pertinent in respect of his relationship, and his being a party in the outset of the suit, are of themselves almost conclusive of the decedent's capacity.

In March, 1824, he was present, aiding and active, in having the decedent execute a will ; and there is no doubt whatever, that the latter was more-competent after that period, than he then was. In the winter of 1827, Mr. Clarke procured Mr. Dean, then a commissioner of deeds, to go to the decedent's, and have him obtain the execution and acknowledgment of two deeds by the decedent and his wife. (Mr. Dean's account of that interview, I ought to mention, is strong proof of the decedent's soundness of mind.) The answer proves the execution of similar deeds by the decedent, the day before his death ; but that part of the answer which states that they came from Mr. Clarke, is not responsive to the bill.

It would not affect the force of this testimony, if it had been proved that the deeds in 1827, were executed pursuant to previous contracts, but it is not proved.

When the court finds Mr. J. B. Clarke, a lawyer, and a man of business, (the leading party also in contesting this will,) dealing with the decedent in 1824, and again in 1827, as a man capable of making a will and executing conveyances ; how can it say in his behalf, that the decedent was not competent ? Various other instances are proved, in which the decedent transacted busi-

ness without any difficulty, and with good judgment. As, the hiring of the office to the Brooklyn Insurance Company in 1824; the lease for ten years to the husband of Mrs. Rose, formerly his domestic, executed in July, 1824.

So of the leases to Mr. Birkbeck in the summer of 1824, for twelve years; and I might refer particularly to Mr. Birkbeck's account of this transaction. In all these instances, the decedent negotiated the terms, and signed the leases, as he did the deeds in 1827.

He made three distinct purchases of land, of the Misses Bowles, in or about 1824, 1825, and 1826. And in short, so far as I can discover, he transacted all his matters of business, with as much capacity, and as much of his personal intervention and direction, for the last three years of his life, as any man could do, however vigorous and undimmed his intellect, who was confined to his room all the time, and a part of each day to his bed.

I now come to the making of his will. For his general capacity on that day, we have the testimony of Rime Scott, as well as that of the three subscribing witnesses. And George Scott saw him the next morning.

Much stress was laid upon the manner in which Mr. Phelps obtained instructions for the draft of the will, and it is insisted that the decedent gave no instructions. Several authorities were cited, to show the necessity of instructions. In one of these, *Billinghurst* v. *Vickers*, (1 Phillimore, 187,) there were no instructions or directions whatever, yet the will was established as to all of it, except the addition in the hand writing of the executor and principal legatee. And it is only where the capacity is doubtful, that proof of instructions is ever required. In another of the cases, *Brogden* v. *Brown*, (2 Addams, 441,) the will was sustained without proof of instructions, although the capacity was questioned, the will not being "inofficious." It was said they might be presumed in that case. I was also referred to *Ingram* v. *Wyatt*, (1 Haggard, 384,) where the instructions came from the principal legatee, who was not a relative, and the testator's relatives were almost wholly excluded. I need not comment upon it, as it was reversed upon appeal. (3 Haggard, 466;) but the opinion of the judge in the prerogative court would sus-

Clarke v. Sawyer.

tain this case on the instructions proved. In *Barry* v. *Butlin*, (1 Curteis, 637,) the subject of instructions was ably discussed by Parke, Baron, delivering the opinion of the judicial committee of the privy council, and he limits it to cases where the person who draws the will, takes a benefit under it, and there are besides, circumstances of suspicion, greater or less, arising from the capacity of the deceased, the extent of the legacy given to such person, the amount of property disposed of, and the claims of other persons upon the testator. And in *Durling* v. *Parker*, (2 Curteis, 225,) Sir Herbert Jenner, not only approves Baron Parke's opinion, but declares that it has always been the doctrine of the prerogative court. And see *Wrench* v. *Murray*, (3 Curteis, 623.)

The instructions here, were obtained in the presence and hearing of the decedent. That he was able to hear, to understand, and to express his assent and his dissent, is not to be doubted ; although Mr. Phelps, who was not accustomed to converse with him, could not understand all his words, beyond his assent and dissent. But each disposition was canvassed, before it was entered upon the solicitor's memorandum ; the decedent himself named the banks in which he had stocks, and decided upon the two executors, excluding one suggested by his wife. During her absence from the room, Mr. Phelps repeated his inquiry in regard to the directions for her benefit. He proceeded with great care to obtain the decedent's views, and made minutes of the whole, and from those drew up the will in his presence. It was then read to him by Mr. Phelps, in the presence of Cornell, the decedent declared his approval, signed it himself, without aid, and acknowledged his signature. He was in his bed most of the time, but was sitting in his chair when he signed it, and continued sitting there unsupported for half an hour, and the witnesses left him in that situation. He appeared desirous to have his will drawn. The other two subscribing witnesses, confirm Mr. Phelps as to his capacity, and one of them says he was present when it was read before it was signed. Two or three witnesses saw the testator after the will was executed, and before his death, when he appeared to be of sound mind, and his bodily condition similar to what it had been previously ; and Mrs. Jewett saw him sitting up

in his chair, the day before he died, and he bowed to her as she passed by his door.

I must say, that there is no circumstance attending the execution of the will, which is calculated to make me doubt its being understood and intended by the decedent, or his capacity to make it.

If there be any thing incongruous in its terms, the fault is that of the solicitor who drew it up, rather than that of the decedent's instructions. It was said to be contradictory and repugnant, to such a degree that it is insensible and void. Confining myself to what I believe from the terms of the will, to have been intended by the decedent, I think he designed to leave all his property to his wife for life, and after her death to have the whole capital go to the persons named and described as residuary devisees and legatees.

If I am correct in this view of his intent, the will was " officious," in the language of Sir John Nicholl. Having no children, it was natural for him to give to his wife the use of the whole during her life. Of the remainder, five-eighths were left to his own blood relations, (assuming for this purpose that G. L. Fisher left a child,) and three eighths to his wife's relatives. The latter had no particular claims upon him, but on the other hand, the Clarke's were no nearer than nieces, and it is not improbable that the claims of their mother's estate, so zealously urged by Gen. Bogardus, in his early sickness, had soured the decedent's mind towards them.

It is to be observed, that a will is not to be set aside on as slight evidence of mental unsoundness, as would overturn a conveyance or contract, in which the consideration was very questionable, or the terms grossly unequal.; or a gift *inter vivos*, to a person who had no reason to expect it from the donor. Valid wills are made daily, by persons in the last stages of disease, when they are too feeble to sit up in bed, or to speak above a whisper, and when the mental powers must necessarily be much impaired. These circumstances are not considered as entitled to weight, unless the dispositions made by the testator are extravagant, or widely different from those which his situation and that of his family would lead a sensible man to expect. I refer for

my views on this subject, to the judgment of Sir John Nicholl in *Ingram* v. *Wyatt*, (1 Haggard, 384,) and of Dr. Calvert, in *Middleton* v. *Forbes*, there stated.

In *Barry* v. *Butlin*, before cited, the will was prepared by the solicitor of the deceased, and he took a considerable benefit from it. The only son of the deceased was entirely excluded. The testator was of slender capacity, and indolent habits, of a retired disposition, addicted to drinking, somewhat singular in his appearance, frivolous and occasionally childish, in his occupations and amusements. He was an old man, and his son's conduct had estranged him. The court deemed him to be of testable capacity, though weak, and the privy council, affirming the prerogative court, sustained the will. In *Williams* v. *Goude*, (1 Haggard, 577,)the testator had an attack of apoplexy in June, 1819, from which he recovered so as to attend somewhat to business, for nearly three years afterwards, and was carried off by another attack in June, 1822. The will was executed ten days before his death, and after a life interest to his wife, it gave his entire property with a trifling exception, to his wife's nephews, excluding his sister's children ; and on the circumstances, it was sustained. The case is instructive in respect of the extravagant opinions given by the witnesses against the testator's capacity ; even his medical attendant saying he was in a state of absolute fatuity. The court nevertheless relied upon acts, rather than opinions.

Upon the whole, I find myself unable to doubt, but that John Fisher, when he made this will, was of sound, disposing mind, memory and understanding, sufficient to make a proper testamentary disposition of his property, and that the will was drawn up and executed in conformity to his intention.

The next ground urged by the complainants, is that the testator was induced to make and publish his will, by fraud and undue influence upon him, and exercised over him, in his last sickness.

This leads me to speak of his second marriage, which was the theme of much invective at the hearing. Besides the force of the answer, contradicting the allegations preliminary to the marriage, they have no support in the testimony, coming as they do

from Lowther, six or eight months previous to its occurrence, and he being unworthy of credit. The answer proves that the parties cohabited, and Ryder proves that Diana slept with the testator after the marriage. On the day of the marriage, the testator sat up all day. His condition had been improving slowly, for nearly a year, and although a paralytic, and without any reasonable hope of entire recovery, he was not a bed-ridden idiot; or incapable of a just appreciation of his condition.

It is not very surprising that a man who had no children, no brothers or sisters, nor any near relatives by blood, who could or would devote their personal attention to his care and comfort, and who stood so much in need of constant care and assistance, as this testator did the last four years of his life, and who had an ample property at his disposal; should seek to secure such attention and assistance by a marriage. The marriage in question was suitable in point of age, and previous connection, and in the person and character of the wife, so far as this case discloses either. It was not a love-match, but it was the dictate of prudence and forethought on one side, and doubtless of interest on the other. Many marriages in early life, have no more worthy principle or motive than these. The marriage gave to Diana, a better claim upon the testator's bounty, but if the testimony pressed upon me is to be credited, it did not increase her power or control over the testator's mind or person.

The allegation of undue influence in this case, rests mainly upon the imbecility of the testator's mind, and as that is not shown to my satisfaction, there is not much to sustain the former. The strongest witness on this point, is Elizabeth Denyse, who it seems lost her place as the housekeeper of G. L. Fisher on his marriage, and she thought that marriage was a part of Diana's doings. She however testifies to nothing beyond Diana's desire to have a will executed.

In this connection, I will refer to the suppositious child of G. L. Fisher, and the stupendous fraud in that behalf, in which Diana Fisher is accused of participating. Taking the answer and testimony together, there is no proof that she knew or suspected that the child was not her brother-in-law's. And I am really at a loss to perceive how Diana Fisher was to be the

gainer by multiplying collateral heirs to her husband, and by such new, and from their tender years pressing, claims upon his bounty, interposing obstacles to a will in her own favor.

One other allegation remains to be noticed; the exclusion of Mrs. James B. Clarke from intercourse with her uncle. This rests wholly upon the testimony of Lowther, and he does not pretend that Diana Fisher ever treated Mrs. Clarke with any incivility or disrespect. If he had so testified, I could not safely rely upon his testimony.

As an entire refutation of the complainants evidence to prove undue influence and fraud, there is the answer of Mrs. Fisher, responsive to the bill. And I will add that in my view, the testimony sustains the answer.

The influence of affection or attachment, is not such an influence as will vitiate a will; or the mere desire of gratifying the wishes of one who is entitled to consideration and remembrance in the disposition of the testator's effects. It was urged that Mrs. Fisher attempted to conceal the fact that a will had been executed, thus exhibiting a consciousness that it would not bear the light. There is no proof of this. The conversation related by Mrs. Park, was with another person. And the three witnesses to its execution, prove no request or apparent design to have the fact concealed.

The authorities cited, do not sustain the complainants, as the case is presented by the pleadings and testimony.

In *Ex parte Fearon*, (5 Ves. 633,) there was clear evidence of undue practices, if not of positive fraud, to the exclusion of the testator's natural daughter, and contrary to his intention repeatedly avowed, and pressed only two days before his death, upon the party who obtained and set up the will.

In *Brydges* v. *King*, (1 Haggard, 256,) the deceased was in a state of extreme weakness and debility, the codicils then made were entirely at variance with her character, her affections, and her former testamentary dispositions. Her capacity was exceedingly doubtful, and the testimony of the witnesses about her person, in support of the codicils, was suspicious and contradictory.

In *Marsh* v. *Tyrrell*, (2 Haggard, 84,) the will was in favor

of a husband who had married the testatrix, when an old maid and far advanced in life. It was entirely at variance with a prior will made after her marriage; and on these facts, and proof of strong means previously used by the husband to obtain the control of her property, her resistance while her health continued, and his contrivances in procuring the execution of the will and codicil propounded, just previous to her death, and while her capacity was doubtful; the court concluded that they were obtained by undue influence and marital authority.

In *Blatchford and wife* v. *Christian*, (1 Knapp's R. 73,) conveyances were set aside as being obtained by fraud and undue influence. The grantor was an old man, separated from all his relatives and connexions, and conveyed nearly all he possessed, to persons who were neither related or connected with him, in derogation of a previous revocable conveyance in favor of his niece. No previous draft of the deeds was made, or opportunity given to him to read, alter or correct them. One was dated in August, and the other in September, and before the close of the same year, the grantor was found by an inquest to be a lunatic.

In *Baker* v. *Batt*, (1 Curteis, 125, which though not cited, bears upon the point,) the will was obtained by a husband from his wife by fraudulent means, only two days before her death, after persevering efforts for two or three months. The testatrix had been ill several months, was about sixty years old, and had been married to the principal legatee, only about nine months when she died.

I ought to observe, in reference to *Marsh* v. *Tyrrell*, and *Baker* v. *Batt*, that the presumption of undue influence exercised by a husband over a feeble and dying wife, is far stronger than any that can be indulged, when a similar charge is made against a wife in respect of her deceased husband.

The case of *Whelan* v. *Whelan*, (3 Cowen, 537,) was one not merely of undue influence. The parties there practised a gross fraud upon their father, (who reposed unbounded confidence in them,) through his passions and his fears.

In my judgment, there is no fraud shown, nor any such undue influence, as ought to induce the court to set aside this devise.

Clarke v. Sawyer.

I must be permitted to say, that I have come to this conclusion with great hesitation and reluctance, and not till after a most diligent examination of all the testimony in the cause. Not that I entertain any doubt in my own mind, but I cannot avoid perceiving, that even with the weight of the responsive answer of Mrs. Fisher in this case, (which was wanting on the probate of the will,) I must have differed in my view of the testimony, from the chancellor's estimation of it on the appeal from the surrogate. And I can never differ, even partially, from so profound, learned and experienced a judge, without feeling a painful distrust of the correctness of my own judgment.

It nevertheless devolves upon me to decide the cause, and in disposing of it to the best of my ability, I must decide in favor of the validity of the devise, so far as it respects its due and proper execution, and the testamentary capacity of Mr. Fisher.

If the complainants desire to have a construction of the devise in this suit, it may be accomplished by a supplemental bill, bringing in the necessary parties. The decree granting such leave, will declare the validity of the will, and reserve further directions.

If they prefer to leave the question of construction for another occasion, this bill must be dismissed with costs, as to the defendants who contested at the hearing.

The arrangement in regard to Magdalena Fisher, may be carried out in the decree.